## State of Vermont v. Larry Messier

[499 A.2d 32]

No. 83-340

Present: **Billings, C.J., Hill, Underwood, Peck and Gibson, JJ.**

Opinion Filed July 19, 1985

Motion for Reargument Denied September 6, 1985

148

*Helen V. Torino*, Franklin County State's Attorney, St. Albans, for Plaintiff-Appellee.

*Andrew B. Crane*, Defender General, and *William A. Nelson*, Appellate Defender, Montpelier, for Defendant-Appellant.

**Peck, J.** Larry Messier (defendant) appeals his conviction, after jury trial, for two counts of sexual assault and one count of lewd and lascivious conduct. All three counts involved a child under the age of sixteen, in violation of 13 V.S.A. §§ 3252(3) and 2602 respectively. We affirm.

The charges arose from an incident in which the defendant was observed engaging in various sexual acts with the witness's daughter, a minor under the age of 16 years. The victim apparently slept through the entire episode, leaving the father as the sole witness to the material acts. Upon conviction, defendant was sentenced to terms of from six to twelve years for each of the two counts of sexual assault and from two to four years for the lewd and lascivious conduct, all to be served concurrently. Because of the number of issues raised on appeal, the facts will be examined in greater detail as they become relevant to each of the claims of error addressed below.

I.

At trial, the charges were supported mainly by the testimony of the father, who had secreted himself in the victim's bedroom in order to substantiate his suspicions of defendant's misconduct. He recounted how the defendant undressed the victim while she was asleep, partially undressed himself, and performed various lewd acts upon her.

Defendant concedes that these acts amounted to lewd and lascivious conduct. However, he maintains that the evidence was insufficient to support the charges of sexual assault. He argues that

none of the sexual contacts contemplated by 13 V.S.A. § 3251[1] were established. The merits of this contention hinge on the proper definition of the term "vulva."

Prior to its final charge to the jury, the court considered an instruction requested by the State that included a broader definition of "vulva" than given to the jury during pretrial instructions. Defendant proposed no instructions of his own; instead, he urged the court to repeat its earlier instruction. However, the court chose to follow a more inclusive definition derived from a standard text on anatomy,[2] similar to that requested by the State. Defendant contends that the court's failure to construe the statute narrowly in his favor was reversible error. We disagree.

As long as the court fulfills its duty to define the essential issues of fact and instruct on the applicable law, it is free to choose its own language.[3] *State* v. *Girouard*, 135 Vt. 123, 139-40, 373 A.2d 836, 847 (1977); *State* v. *Audette*, 128 Vt. 374, 378, 264 A.2d 786, 789 (1970). When dealing with statutory language, the court should avoid overdefinition, but may, in its discretion, enlarge upon a term though its meaning may be commonly known. *State* v. *Girouard, supra*, at 140, 373 A.2d at 847; *State* v. *Audette, supra*, at 378-79, 264 A.2d at 789.

Whether or not the term "vulva" is so well established in the common parlance as to obviate any need for elaboration is open to question. Nevertheless, in discussing the purpose of 13 V.S.A. § 3252, Chief Justice (then Justice) Billings, writing for the Court stated:

> [T]he clear legislative intent behind the sexual assault statute is that the criminal nature of the conduct stems from the aggressive violation of the sanctity of the human body

---

[1] 13 V.S.A. § 3251(1) reads: A "sexual act" means conduct between persons consisting of contact between the penis and the vulva, the penis and the anus, the mouth and the penis, the mouth and the vulva, or any intrusion, however slight, by any part of a person's body other than the fingers or any object into the genital or anal opening of another.

[2] The precise name of the text relied on by the court below does not appear. However, the same definition appears in *Gray's Anatomy*. H. Gray, *Gray's Anatomy*, 1330 (29th ed., Goss 1973); accord *Dorland's Illustrated Medical Dictionary*, at 1725 (25th ed. 1974).

[3] In his brief, defendant also contends that the court erred in using Latin medical terms in its instruction. However, no such objection was made below, and we cannot say that the description given was so far beyond the understanding of the ordinary juror as to constitute plain error under V.R.Cr.P. 52(b).

and the consequent destruction of the victim's self-worth. See Journal of the House 548 (1977). Given this intent it is incumbent upon this Court to avoid a construction . . . which would increase the quantum of proof necessary to establish the physical act of violation addressed by the statute.

*State* v. *Bourn*, 139 Vt. 14, 17, 421 A.2d 1281, 1282 (1980).

■ In giving effect to this expression of the legislative purpose, we find that the broader definition employed by the trial court in its charge to the jury not only conformed to the standard medically recognized definitions, but its use within the context of the charge was not an abuse of discretion. There was no error.

Given the physical area circumscribed by the court's instruction to the jury, we must now determine whether the evidence, when viewed in the light most favorable to the State, was sufficient to establish the element of "contact," 13 V.S.A. § 3251, in the mind of a reasonable juror beyond a reasonable doubt. *State* v. *Fuller*, 144 Vt. 485, 487, 479 A.2d 173, 174 (1984) (quoting *State* v. *Derouchie*, 140 Vt. 437, 445, 440 A.2d 146, 150 (1981)).

"Contact," as applied to the sexual assault statutes, is defined as "mere touching, however slight." *State* v. *Bourn, supra*, at 16-17, 421 A.2d at 1282. It is not necessary to repeat here the language employed by the father in his testimony; it was sufficient nevertheless to support a finding of contact in accordance with the charge embodied in the second count of the State's three count information. .

Turning to the first count, charging that defendant's proscribed acts included contact between his sex organ and the vulva of the child, the position of the bodies obscured the witness's observations, and the witness's testimony was only circumstantial evidence of contact. Nevertheless, we hold that the State has satisfied its burden to prove its case.

Defendant suggests several possibilities falling short of the required contact. We have held, however, that guilt in a criminal case may be proved by circumstantial evidence alone, if it is proper and sufficient in itself. *State* v. *Kerr*, 143 Vt. 597, 603, 470 A.2d 670, 673 (1983) (citing *State* v. *Colby*, 140 Vt. 638, 641-42, 443 A.2d 456, 457 (1982)). The State is not required to exclude every reasonable hypothesis of innocence in proving its case. *State* v. *Derouchie, supra*, at 445, 440 A.2d at 149-50. The only

test the State must satisfy, whether the evidence is direct or circumstantial, is proof beyond a reasonable doubt. *Id.; State* v. *Kerr, supra.* "The trier of fact is not required to search out a series of potential explanations compatible with innocence, and elevate them to the status of a reasonable doubt." *State* v. *Veilleux*, 140 Vt. 517, 522, 439 A.2d 277, 280 (1981).

■ In the present case, the State was not required to prove penetration; it needed only to show contact within a defined area of the pubic region. Given the relative positions of the bodies, as described by the father, the State has satisfied its burden, even though the evidence was circumstantial and there was no medical confirmation of such contact.

## II.

Defendant next raises a series of issues that arose from pretrial discovery. Three of these issues revolve around the State's attempt to obtain nontestimonial identification evidence from the defendant. A fourth issue involves a condition of defendant's release, imposed by the superior court, that restricted his attorney's access to the State's witnesses. We will address the former issues first.

Nearly two weeks after the State filed its information, it requested an order allowing it to acquire nontestimonial identification evidence; in this case, "body samples" from defendant; more specifically, samples of defendant's saliva, blood, and pubic and head hair. The order was granted ex parte. Shortly before the samples were to be taken, defendant moved to modify the court's order to allow, inter alia, the presence of a defense investigator and attorney at the sampling process. Defendant also moved to quash the order on due process grounds. Due to an apparent lapse of communication by the court, notice of a stay of the procedure pending resolution of defendant's motions was not communicated to the State until after the samples were taken. Defendant then attempted to obtain similar samples from the male members of the victim's family. Although this request was denied, he prevailed on a motion to suppress the State's samples.

Comparison tests of the suppressed hair samples yielded negative results; they did not match any of the samples taken from the scene of the offenses or from the clothing of the victim. Later, defendant proposed to utilize these negative results in his case-in-

chief. The court cautioned him that doing so would open the door to all the evidence taken in the illegal search, thus enabling the State to introduce potentially incriminating evidence produced from defendant's blood sample. Defendant accepted the risk and, over his objection, the State was then allowed to present the blood sample evidence. Defendant claims error in the denial of his request for blood and hair samples of members of the victim's family, the admission of the State's evidence of the previously suppressed blood sample of the defendant, and the subsequent admission of the blood test results into evidence.

■ The body samples taken from defendant by the police pursuant to the court's nontestimonial identification order were suppressed on constitutional grounds. The State does not challenge the merits of the suppression order. Therefore, the question to be resolved here is whether evidence, tainted by a constitutional infirmity, can be used by the State to *rebut* an inference, favorable to defendant, created by the latter's introduction of a *part* of the suppressed evidence during his case-in-chief. The trial judge took the position that the defendant opened the door to all of the suppressed evidence by selecting and introducing a part of that evidence. We agree and, for the reasons set forth below, we hold there was no error.

At the outset, we note that in *State* v. *Kilborn*, 143 Vt. 360, 466 A.2d 1175 (1983), we reached a different result, holding that statements by the defendant to the police, in violation of her *Miranda* rights, were not admissible to rebut an inference raised by defense counsel's cross-examination of a police officer during the State's case-in-chief. *Id.* at 364, 466 A.2d at 1177. In its opinion, this Court recognized that illegally obtained evidence might be used for *impeachment* purposes. However, because the State cited no authority relating to the use of suppressed evidence for *rebuttal* purposes, the opinion added that we are "not inclined, *on the facts of this case*, to create a further exception to the [exclusionary] rule." *Id.* (emphasis added).

It is clear that we did not rule out the *possibility* of extending exceptions to the exclusionary rule to permit the rebuttal of inferences raised by a defendant through the use of only selected parts of the suppressed evidence. Indeed, a substantial number of courts which have considered the issue on the basis of rebuttal have held that, under proper circumstances, otherwise inadmissible evidence may be used by the prosecution in a criminal case to

rebut inferences resulting from the use of parts of the evidence by a defendant. *United States* v. *Nanez*, 694 F.2d 405, 410 (5th Cir. 1982); *United States* v. *Caro*, 637 F.2d 869, 875 (2d Cir. 1981); *United States* v. *Mavrick*, 601 F.2d 921, 933 (7th Cir. 1979); *Charles* v. *Anderson*, 610 F.2d 417, 420 (6th Cir. 1979); *United States* v. *Two Bulls*, 577 F.2d 63, 66 (8th Cir. 1978); *United States* v. *Fairchild*, 505 F.2d 1378, 1383 (5th Cir. 1975). Moreover, the right to use suppressed identification evidence on redirect examination during the prosecution's case-in-chief to rebut an unfair inference raised on cross-examination of a prosecution witness, as in *Kilborn*, has been approved. *United States* v. *Johnson*, 502 F.2d 1373 (7th Cir. 1974).

In the instant case, defendant's selective use of a part of the suppressed body sample evidence was exculpatory; it was offered for that specific reason. The implication was that the hair sample evidence coupled with the negative test results was the *only* body sample taken by the State. This inference was unfair to the State since the police had, in fact, taken two other body samples with inculpatory results.

In this situation we hold that the trial court ruled properly that defendant had opened the door to the introduction, in rebuttal of the defense, of the remainder of evidence obtained under the nontestimonial identification.

In any event, taking the remainder of the evidence in the light most favorable to the State, and excluding contradictory evidence, as we must do, *State* v. *Fuller*, *supra*, at 487, 479 A.2d at 174, it was so conclusive that if there had been error it would have been harmless. *United States* v. *Johnson*, *supra*, at 1376. The father was an eyewitness to the offense itself; his testimony was overwhelming evidence of guilt. The father also testified that defendant cried out "I'm sorry!" as the former dragged him up the stairs of the basement bedroom where the victim had been sleeping. The father's credibility, the weight to be given his testimony and its persuasive effect were matters for the jury alone to determine. *State* v. *Girouard*, *supra*, at 135, 373 A.2d at 844. Further, the prejudicial effect of establishing defendant's blood type as type A was minimal if there was any, given the testimony of an expert that a substantial percentage of the population also have type A blood. Defendant has not convinced us that the blood sample evidence contributed to the verdict, or that the verdict would have been other than guilty if the evidence had been ex-

cluded. Therefore, if there had been error, the standards for determining that it was harmless are satisfied: (1) there was overwhelming evidence to support the conviction, and (2) the challenged evidence did not contribute to the conviction. *State* v. *Shores*, 143 Vt. 224, 228, 465 A.2d 269, 271 (1983); *State* v. *Kilborn, supra*, at 365, 466 A.2d at 1178. Accordingly, on the facts of this case, we hold there was no error in the court's ruling allowing the State to inquire into the results of the entire sampling procedure.

■ Regardless of the foregoing discussion, defendant argues further that because the evidence of blood type was inclusive only, and not conclusive, its value as evidence was entirely speculative. In support of his position, defendant cites civil cases which hold that inclusive blood-type evidence is inadmissible to prove parentage; he then refers us to decisions which apply that rule to rape cases. However, these cases represent a minority view; the majority of jurisdictions hold that blood-type evidence may properly be used in aid of identification in criminal cases, and objections go to its weight, not its admissibility. See, e.g., *People* v. *Bush*, 103 Ill. App. 3d 5, 13, 430 N.E.2d 514, 520 (1981); *Commonwealth* v. *Benoit*, 382 Mass. 210, 221, 415 N.E.2d 818, 825 (1981); *People* v. *Young*, 106 Mich. App. 323, 331, 308 N.W.2d 194, 197-98 (1981); Annot., 2 A.L.R.4th 500, § 4 (1980). We so hold today. There was no error in admitting the blood sample result on the grounds it was speculative.

Defendant argues next that the court erred in denying his request to have body sample evidence taken from the male members of the victim's family. The apparent purpose of the evidence was to support defendant's claim that this entire matter was merely an elaborate ruse to cover up certain conduct within the family, on the one hand, or as a devise to get rid of defendant as an unwanted lodger, on the other.

■■ Defendant relies on V.R.Cr.P. 41.1(k) as authority for his request.[4] However, by its language, Rule 41.1(k) applies only

---

[4] V.R.Cr.P. 41.1(k) provides as follows:

*Nontestimonial Identification Order at Request of Defendant.* A person arrested for or charged with an offense may request a judicial officer to order a nontestimonial identification procedure. If it appears that the results of specific nontestimonial identification procedures will be of material aid in determining whether the defendant committed the offense, the judicial officer shall order the state to conduct such identification procedure *involv-*

to procedures involving a defendant himself, not to nonparty witnesses. The purpose of this rule is to allow the suspect an opportunity to initiate the procedures on his own, should it be in his best interests and the State has failed to do so, or if he desires some tests in addition to those provided by the State. See Reporter's Notes, V.R.Cr.P. 41.1(k).

Defendant's reliance on *State* v. *Bailey*, 144 Vt. 86, 475 A.2d 1045 (1984), is similarly misplaced. *Bailey* involved a "failure to disclose" involving possibly exculpatory evidence lost by the State. This is not such a case. Accordingly, there was no error. That is not to say that there could never be any compelling circumstances under which the granting of such a request might be constitutionally required. We simply hold that no such circumstances were present here.

The last pretrial issue, unrelated to the nontestimonial identification procedures, involves an order that restricted defendant's access to the State's witnesses immediately after his arrest. The order was requested by the State and was contained in defendant's conditions of release. It provided that: "The defendant's attorney and the state's attorney shall arrange necessary interviews [and] depositions in connection with this case and in [the] event of disagreement court to hear motions from counsel." The order was issued on January 25, 1982, the date defendant was charged with the subject offenses. Defendant alleges that the State refused to make the victim available for a deposition until February 1, 1982, and that this delay resulted in a denial of his due process.

We begin by reviewing V.R.Cr.P. 16.2, which regulates the discovery process in a criminal trial. Rule 16.2(a) prohibits counsel for either side from unreasonably interfering with the other's investigation of the case. Although based on ethical considerations, see Reporter's Notes, V.R.Cr.P. 16.2, the rule is in accord with the principle that witnesses in a criminal trial are the property of neither the state nor the defendant. *United States* v. *Felice*, 481 F. Supp. 79, 85 (N.D. Ohio 1978). The prosecution may not deny defendant access to its prospective witnesses without justification. *Kines* v. *Butterworth*, 669 F.2d 6, 9 (1st Cir. 1981); see *United States* v. *Felice, supra; United States* v. *Castillo*, 615 F.2d 878, 882 (9th Cir. 1980).

---

*ing the defendant* under such terms and conditions as the judicial officer shall prescribe. (Emphasis added).

■ In appropriate circumstances the court may, in its discretion, issue a protective order restricting access to a prosecution witness. V.R.Cr.P. 16.2(d). The court below, believing that unlimited access to the victim's family by defendant would be harmful, did just that. However, the order was only mildly restrictive, and did not completely bar defendant's access to those witnesses.

For defendant to prevail on a claim of denial of due process, he must show that prejudice resulted which prevented him from receiving a fair trial. *Kines* v. *Butterworth, supra* (quoting *Lisenba* v. *California*, 314 U.S. 219, 236 (1941)). Defendant complains that the unavailability of the victim for one week after arraignment prevented him from determining the extent of the victim's unaided memory as protection against the State's ability to "coach" the witness before trial. We disagree.

After the victim was made available to defendant, he had eight months before trial in which to interview her. He did not do so. The defendant instead relied on her deposition, taken a week after his arraignment, to challenge her testimony at trial. The record shows that defendant conducted a careful and extensive cross-examination of the victim, pointing up various discrepancies between her trial and deposition testimony. We fail to see how the one week delay deprived defendant of his ability to defend himself. Accordingly, we hold there was no prejudicial error. See *United States* v. *Mayo*, 705 F.2d 62, 77 (2d Cir. 1983) (no prejudice to defendant in light of his extensive cross-examination of witness at trial).

### III.

Defendant next presents two claims of error that bear on evidentiary issues that arose during trial.

Defendant contends that the court erred in admitting hearsay testimony by a police officer describing a demonstration by the victim's father of his actions on the night of the offense. Although the father himself testified to nearly the same facts, defendant argues that *State* v. *LaRose*, 137 Vt. 531, 408 A.2d 651 (1979), is controlling and requires reversal.

In *LaRose* we reversed the defendant's conviction for sexual assault because of the prejudicial effect of hearsay repetition of the complaining witness's statement by a police officer. *Id.* at 532, 408 A.2d at 652. In that case, the length of the jury deliberations, the

fact that the officer testified before the complaining witness, and the extent to which the State relied on hearsay to establish its case, clearly demonstrated the quality of prejudice required for reversal. However, we said that there may be times when reversal is not required because of the availability of the declarant for cross-examination. *Id.* In the instant case, the declarant-father testified first, giving an exhaustive account of his activities on the night in question, thus providing adequate nonhearsay support for the State's case. The police officer testified later, and was cross-examined by defendant who, incidentally, inquired into many of the same facts himself.[5]

The court apparently admitted the trooper's testimony, over defendant's hearsay objection, on the grounds that the acts the officer was describing were not words. Although research reveals no Vermont case law on this subject, modern authorities recognize that nonverbal conduct, if intended as an assertion, may constitute hearsay. 4 J. Weinstein, Weinstein's Evidence ¶ 801(a)[01], at 801-52 to 53 (1984) (interpreting Federal Rule of Evidence 801(a)(2)); E. Cleary, McCormick's Handbook of the Law of Evidence § 250 (2d ed. 1972); V.R.E. 801(a)(2) (although, the Vermont Rules of Evidence were not in effect at trial). If defendant's objection was overruled because of the absence of verbal statements, it was error. However, in view of the merely cumulative nature of the officer's testimony, and the fact that the father was available for further cross-examination, or to be called as a defense witness, the error, if any, was harmless. *State* v. *Cushman*, 133 Vt. 121, 125, 329 A.2d 648, 651 (1974).

Defendant's second claim in this section is that the court erred in admitting evidence of a prior "bad act" of defendant, and in later failing to instruct the jury on the limited purpose for which it was received.

In order to explain why the victim's father had concealed himself in his daughter's bedroom, the State had to elicit testimony that someone had been suspected of earlier misconduct with the

---

[5] Compare *State* v. *Hall*, 145 Vt. 299, 305-06, 487 A.2d 166, 170 (1984), in which we held that testimony of the investigating police officer relating vehicular speeds, highway distances, and the situs of the offense, the testimony being based on information supplied by complaining witnesses, was not reversible error when the complaining witnesses were present in court and available to the defense, and finally, the officer's testimony was generally cumulative and confirmatory of earlier testimony by complainants.

victim. Defendant conceded at oral argument that some background was necessary, but argued that it was improper to expose the nature of the misconduct and the identity of the defendant as the person suspected.

Defendant was aware that this subject might be broached at trial and made a proper objection to its possible use. During trial, the State did attempt to set the stage for the father's subsequent actions. However, the court was critically sensitive to the potential for prejudice and took appropriate steps to strike answers that implicated the defendant and to confine questioning on the subject to as neutral a description as possible. Defendant acquiesced in these efforts. After one possibly prejudicial answer that was objected to and stricken,[6] the State took care, in laying the foundation for the father's testimony, to do so in as nonprejudicial a manner as possible. Defendant made no objections to the questioning, nor did he request an instruction to limit the use of the testimony as an explanation for the father's actions and not as evidence of defendant's character.

Defendant's argument involves alleged errors that were not objected to or otherwise raised at trial, and are raised here for the first time. Generally, such errors are not properly before us for review, unless they rise to the level of "plain error," *State* v. *Mecier*, 145 Vt. 173, 177-78, 488 A.2d 737, 740-41 (1984), that is, "they are so grave and serious as to strike at the very heart of a defendant's constitutional rights or adversely affect the fair administration of justice." *Id.* at 178, 488 A.2d at 741 (citing *State* v. *Boucher*, 144 Vt. 276, 282, 478 A.2d 218, 222 (1984)); V.R.Cr.P. 52(b). Defendant has not made a showing of plain error. In the absence thereof, we find no merit in this claim, having been raised for the first time on appeal. *Id.*

## IV.

The following issues concern other alleged errors arising during trial. Defendant claims that seating arrangements in the trial courtroom deprived him of his right to confrontation and that the State's comments on the veracity of the witnesses and the court's

---

[6] Absent a showing of prejudice, we assume that the jury followed the instruction not to consider the stricken testimony. *State* v. *Foy*, 144 Vt. 109, 117, 475 A.2d 219, 224 (1984). We find no such prejudice here.

instruction as to the age of the victim violated his right to a fair trial. We will address these issues in the order presented.

One of the primary purposes of the Sixth Amendment's confrontation clause is to secure an effective opportunity for cross-examination. *United States ex rel. Blackwell* v. *Franzen*, 688 F.2d 496, 499-500 (7th Cir. 1982); see *Ohio* v. *Roberts*, 448 U.S. 56, 63 (1980); *United States* v. *Varella*, 692 F.2d 1352, 1355 (11th Cir. 1982).

In the instant case, defendant was not denied an opportunity to see or hear the witnesses at trial. Cf. *Herbert* v. *Superior Court*, 117 Cal. App. 3d 661, 671, 172 Cal. Rptr. 850, 855 (1981) (defendant's right to confrontation of witness abridged where he is unable to see witness). His claim is only that he was unable to view parts of photographs as they were pointed out and discussed by witnesses on the stand. This argument has little merit. Defendant was represented by two competent counsel who were shown most of the photographs in question before they were discussed by the witnesses. The witnesses were subjected to adequate and effective cross-examination. He made no timely objection to the manner in which the photographs were being used, nor did he take any steps to protest the seating arrangement until after the trial was completed and it was obviously too late for the court to take any curative action even if it seemed desirable to do so. Defendant's right to confrontation was not violated.

It is axiomatic in criminal jurisprudence that prosecutors must refrain from expressing their personal belief as to the defendant's guilt in their closing argument. *State* v. *Lapham*, 135 Vt. 393, 407, 377 A.2d 249, 257 (1977); *State* v. *Parker*, 104 Vt. 494, 500, 162 A. 696, 699 (1932). The prosecutor in the instant case made remarks that bordered on the impermissible. However, defendant failed to object to these remarks below. Accordingly, this issue is controlled by our recent decision in *State* v. *Bailey, supra*, at 99-100, 475 A.2d at 1053, which requires that the prosecutor's transgression rise to the level of plain error before it will merit consideration. *Id.* Defendant contends the remarks violated his right to a fair trial, and urges us to find plain error.

The remarks were, for the most part, of the type that, defendant claims, reflected the prosecutor's personal opinion or belief. They contained such expressions as "I think . . . ;" "I don't think . . . ," and the like. Defendant has obviously combed the argument to produce six examples. However, some of these

did not reflect the prosecutor's own belief or opinion, but what he thought the jury would believe, and virtually all of them were clearly rhetorical, even if technically improper. Generally, they were short and widely scattered throughout the prosecutor's argument. We take this occasion to caution prosecutors once again against the use of remarks expressive of their personal views concerning the guilt of an accused, the merits of the evidence, and the credibility of witnesses, even in the extreme cases. However, considering the remarks challenged here in the context of the prosecutor's argument as a whole, *Bailey, supra*, the weight of the evidence, and the court's charge to the jury that the arguments of counsel are not evidence, and that jurors are the sole judges of credibility, we hold that plain error has not been demonstrated.

Defendant's final challenge to the trial proceedings involves an instruction given to the jury in which the court referred to the victim as "12 years old." Since all three counts with which defendant was charged require that they be committed with a child under the age of 16, the victim's age was an essential element of each offense. Therefore, defendant argues, the court's reference amounted to a directed verdict on the age element. Again however, no objection was raised below. Therefore we must once more apply the plain error test. V.R.Cr.P. 30; V.R.Cr.P. 52; *State* v. *Boucher*, 144 Vt. 276, 286, 478 A.2d 218, 224 (1984); *State* v. *Chambers*, 144 Vt. 377, 382, 477 A.2d 974, 978 (1984).

Specifically, defendant quotes that portion of the charge in which the trial court instructed:

> When you are considering the testimony of [the victim, her sister and her brothers], be especially careful when you determine the importance you think it deserves. You should bear in mind that [the victim] is 12 years old . . . .

Assuming that this portion of the charge was error, defendant nevertheless quotes it out of context. The transcript discloses that not only did the trial judge continue by reciting the ages of the victim's sister and brother, both of whom were also under sixteen, and who, like the victim, were both called as witnesses, but equally significant, the *express* purpose of this phase of the charge was to instruct the jury on the factors to be considered in

evaluating the testimony of children.[7] *State* v. *Stacy*, 104 Vt. 379, 394-95, 160 A. 257, 263 (1932).

The record reveals that before commencing her direct examination of the victim, the prosecutor examined the witness for competency as required in the case of child witnesses. *In re M. W. R.*, 143 Vt. 6, 10, 458 A.2d 1132, 1134 (1983). In response to these questions, the witness indicated that she was then 12 years old, that she knew the difference between truth and lies, that it was bad to tell lies, and that she knew the consequences of lying ("you get into trouble"). The witness promised not to tell any lies during her testimony. *Id.* Defendant did not question the victim's qualifications, nor her testimony that she was 12 years old, although she was otherwise cross-examined extensively. In short, the age of the victim was not disputed at any time during trial.

At the precharge conference in chambers, the trial judge informed the attorneys that his charges would include the ages of the child-witnesses, including the victim, as given by them during their testimony. The judge said: "I'll specify that [the victim] is 12, [her sister] is 11, [her brother] is 8. . . ." The judge continued with language virtually identical to that employed later in his actual charge (see footnote 7). Again no objection was raised to the proposed language.

Finally, the record indicates that during the course of his charge, and a later clarifying charge, the court repeated the elements of the offense at least sixteen times, including the age element, and instructed the jurors that they must find the State had established each element beyond a reasonable doubt in order to convict.

There can be no question that the State satisfied its burden to prove that the victim was under the age of 16. Her own unchallenged testimony that she was 12, which was corroborated by the father, was more than sufficient. Viewing the instruction as a whole, coupled with defendant's failure to interpose any objection thereto at any time in the court below, we hold that even if there was error, it was not plain error under the circumstances

---

[7] The trial court instructed the jury: "Although children do not necessarily tell falsehoods, they may be more impressionable and have stronger imaginations than adults. Also, you should be careful not to give their testimony greater importance than it deserves because of any natural sympathy for them as children."

described, and the claim was waived. *State* v. *Anderkin*, 145 Vt. 240, 245, 487 A.2d 142, 144 (1984) (holding that a claimed finding of fact made by the trial court, properly for determination of the jury, was waived where raised for the first time on appeal).

## V.

Defendant next claims that the nine month delay between arraignment and trial deprived him of his right to a speedy trial.

Recently, in *State* v. *Snide*, 144 Vt. 436, 442-44, 479 A.2d 139, 143-44 (1984), we reviewed the law regarding speedy trial claims. Citing *Barker* v. *Wingo*, 407 U.S. 514, 530 (1972), as well as our own cases interpreting *Wingo*, we reiterated the four factors relevant to the disposition of such a claim: "length of the delay, reason for the delay, defendant's assertion of his right, and prejudice to the defendant." *Snide, supra,* at 442, 479 A.2d at 143. We noted further that the length of delay becomes the "triggering mechanism" that indicates sufficient presumptive prejudice to justify consideration of the remaining three factors.

In *State* v. *Unwin*, 139 Vt. 186, 195, 424 A.2d 251, 257 (1980), we held that "a delay of more than six months in a case involving an incarcerated defendant is long enough to require that the other factors be considered." However, the length of elapsed time alone is not determinative of the issue. Delays attributable to proceedings necessary to determine competency to stand trial and pretrial motions are excluded from consideration. *State* v. *Williams*, 143 Vt. 396, 401, 467 A.2d 667, 669 (1983). In the case at bar, defendant filed no less than nineteen motions relating to discovery and dismissal that had to be disposed of before trial could commence. The first of these motions was filed on February 1, 1982, six days after arraignment; the last was filed on the day of trial itself. He was also involved in the type of competency proceedings alluded to in *Williams, supra,* and took a total of twenty-one depositions. The time consumed by the pendency of these matters may ordinarily be excluded as having tolled the speedy trial time limits. 12 V.S.A. App. VIII A.O. 5, § 4; see *United States* v. *Horton*, 705 F.2d 1414, 1416 (5th Cir. 1983) (time for pendency of defendant's motions excludable to bring nine month delay within speedy trial limits); *United States* v. *Campbell*, 706 F.2d 1138 (11th Cir. 1983) (excludable periods for

defendant's motions for discovery and dismissal brought nine month delay within speedy trial limits).

Defendant does not hold the State responsible for the delays he has claimed to have suffered; rather, he contends that the fault was with the court. Because of the unavailability of a single assigned judge in Franklin County during that period, six different judges had to be assigned to dispose of the various pretrial matters. This "juggling" of judicial assignments is claimed to have resulted in an inordinate delay in the pretrial proceedings.

In *State* v. *Franklin*, 136 Vt. 568, 396 A.2d 138 (1978), we held that a thirteen month delay in disposing of a single suppression motion by the trial court compelled a reversal of the defendant's conviction. *Id.* at 570-71, 396 A.2d at 139-40. The circumstances in the instant case, however, are entirely different. The delay of nine months includes time consumed by the consideration of nineteen different motions. The amount of delay occasioned by the multiplicity of judges during the pretrial proceedings is speculative at best. Neither defendant nor the record disclose any specific periods of time that represented unnecessary or unwarranted delay due to the changes in judicial assignments. The delay was due primarily to defendant's strategy, and not the dereliction of the court. See *State* v. *Roy*, 140 Vt. 219, 228, 436 A.2d 1090, 1094 (1981). This claim based on delays primarily of his own making is without merit. *Id.* The delays not attributable to defendant himself are not shown as sufficient to require full consideration of the remaining three *Wingo* factors. No constitutional violation appears.

## VI.

Finally, defendant claims that he was deprived of due process because of the presence of the lay assistant judges at sentencing. Defendant maintains that sentencing entails questions of law which preclude participation by lay judges under *State* v. *Dunkerley*, 134 Vt. 523, 365 A.2d 131 (1976).

We recently addressed this same issue in *State* v. *Hamlin*, 146 Vt. 97, 110-12, 499 A.2d 45, 54-55 (1985). In that case we declined to extend the holding in *Dunkerley*, pointing out that statutes in at least six states allowed jury sentencing in felony trials, and at least two states by statute in capital cases only. We noted further that the United States Supreme Court has held that jury partici-

pation at sentencing does not violate due process. *Chaffin* v. *Stynchcombe*, 412 U.S. 17, 22 (1973). We concluded that, in the light of these cases, it would be anomalous to hold that sentencing by juries does not constitute a violation of due process, and yet hold that sentencing by, or with the participation of, lay judges does violate due process.

In light of the above, we hold that *Hamlin* is controlling on this issue, and conclude therefore that defendant's constitutional rights to due process under the Fourteenth Amendment were not violated by the participation of the assistant judges in the sentencing process.

*Affirmed.*