2008 VT 71

# State of Vermont v. Aaron Jackson

[956 A.2d 1126]

No. 07-006

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed May 16, 2008

174

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Paul S. Volk* of *Blodgett, Watts, Volk & Sawyer, P.C.*, Burlington, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Defendant Aaron Jackson appeals from his convictions, after a jury trial, for kidnapping, 13 V.S.A. § 2405(a)(1)(C), unlawful restraint, *id.* § 2407(a)(1), and two counts of simple assault by physical menace, *id.* § 1023(a)(3). Defendant received concurrent terms of seven to thirteen years on the kidnapping and restraint convictions and zero to one year on each of the menace convictions. In this appeal, he contends that the trial court erred by: (1) admitting certain identification evidence without conducting a *Wade* hearing; (2) admitting a hearsay statement as an excited utterance under Rule 803(2) of the Vermont Rules of Evidence; (3) denying defendant's motion for judgment of acquittal on the kidnapping charge; (4) denying defendant's motion for judgment of acquittal on the unlawful restraint charge; (5) permitting the state's attorney to "vouch" for the truthfulness of the State's witness and the untruthfulness of defendant; and (6) allowing the state's attorney to imply in closing argument that defendant was a drug dealer. Defendant also asserts that the above-listed errors had the cumulative effect of denying him a fair trial. We affirm.

## I. Facts

¶ 2. In early December 2005, Matt M. owed defendant over five hundred dollars. One day, as Matt was walking to a friend's house, he saw defendant, who told him he wanted to talk about something — Matt assumed it was the money — later that day. A few hours later, Matt called defendant from Larow's Market to ask him for a ride home, and to talk with him about the money. When defendant did not arrive after twenty or thirty minutes, Matt called him again. When defendant arrived, Matt got into the front seat. Defendant then drove around the corner, and a man wearing a hooded sweatshirt got into the back seat. They drove out of Burlington on Route 127, and the passenger began choking Matt from behind with his forearm. Matt asked what was happening, and defendant accused Matt of stealing money from defendant's house. Matt denied stealing the money, and the back seat passenger responded by choking him with a belt. Matt had

difficulty breathing with the belt around his neck and reported being scared and nervous.

¶ 3. Around this time, defendant drove the car onto Interstate 89 in Colchester and began driving north, eventually exiting the Interstate at the Milton exit, about ten miles from Larow's. Defendant pulled out a can of mace and threatened Matt with it. Matt then concocted a story that "Justin Finnegan" had the money at an apartment above a Rent-A-Center in Burlington, near Larow's. The apartment Matt described was actually the home of Jodie S. and his girlfriend, Joanne R. Defendant reversed course and began driving back towards Burlington. He stopped in Winooski and pulled a hat down over Matt's face to prevent him from seeing where they went next. They "drove around for a while" and made one stop, which Matt assumed was somewhere in Winooski. During this time, the back seat passenger kept tension on the belt around Matt's neck, and he was "barely" able to breathe.

¶ 4. After making one stop and one telephone call, defendant drove the car to the Rent-A-Center and stopped in front of the store. The passenger in the back seat put a gun to Matt's head and said "You know what this is, right?" Upon exiting the car, Matt, defendant, and the passenger went to the door of the apartment above the Rent-A-Center. Matt knocked on the door. Jodie S.'s girlfriend, Joanne, answered the door. Defendant and the passenger, who still had the gun, entered the apartment. Matt "took off down the stairs," ran to Larow's Market, and called the police. Defendant went into the apartment and asked for "Justin" while the passenger pointed the gun at Jodie S. Justin K. said he was Justin, and the man with the gun put it to Justin K.'s head and said "I'm looking for Justin Finnegan." Jodie said he had the wrong Justin, and that he did not know anyone named Justin Finnegan. At this point defendant and the passenger left the apartment, the passenger pointing the gun at the occupants as they left. Defendant was subsequently charged with kidnapping and unlawful restraint of Matt M. and with two counts of assault by menace of Justin K. and Jodie S.

## II. The in-court identification

¶ 5. Defendant contends that the trial court erred in admitting an in-court identification of him by Jodie S., who had been unable to identify defendant until seeing him at his arraignment. Defend-

ant argues that a *Wade* hearing should have been held before Jodie was permitted to testify to defendant's identity at trial. See *United States v. Wade*, 388 U.S. 218, 242 (1967). That hearing, according to defendant, would have shown that Jodie's ability to identify defendant at the arraignment was irreparably tainted by the circumstances of the identification. Defendant did not ask for a *Wade* hearing or object to the identification, however, despite being explicitly invited by the trial court to raise any objections he might have. Defendant also fails to raise a claim of plain error on appeal.

¶ 6. Defendant argues that the *Wade*-hearing and identification issues are properly preserved for appeal because trial counsel "clearly noted that the testimony regarding the identification by this witness was different than previous testimony by the witness and that the identification was based upon the witness' earlier identification at the arraignment." Defendant also notes, in support of his preservation argument, that the State identified the issue in suggesting voir dire, and that the court permitted voir dire "in order to develop the factual circumstances necessary to rule on the issue."

¶ 7. This falls well short of the "specificity and clarity" with which we require issues to be raised at trial in order to be preserved for appeal. *State v. Ovitt*, 2005 VT 74, ¶ 13, 178 Vt. 605, 878 A.2d 314 (mem.). The "issue" the trial court ruled on was *not* whether a *Wade* hearing was necessary — and this is natural enough, in light of defendant's failure to ask for one when invited to — but simply whether the identification was admissible at all. The *Wade*-hearing issue was not preserved, and defendant does not contend that it was plain error not to hold a *Wade* hearing. Accordingly, we decline to address whether a *Wade* hearing was necessary under these circumstances. *State v. White*, 172 Vt. 493, 499, 782 A.2d 1187, 1192 (2001) (declining to address claim raised for the first time on appeal where party failed to assert plain error); see also *Watkins v. Sowders*, 449 U.S. 341, 349 (1981) (holding that, although *Wade* hearing may be constitutionally mandated under certain circumstances, it is not mandated in all cases).

### III. The excited utterance

¶ 8. Defendant next takes issue with the admission, as an excited utterance, of a hearsay statement by Justin K., one of the

victims of the assault by menace. The statement was elicited by the State during the testimony of Officer Helrich. See V.R.E. 803(2) (allowing admission of statement, though declarant is available as a witness, when the statement relates "to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). Defendant contends that admitting the statement was error for two reasons: (1) it was not an excited utterance, and therefore its admission violated Rule 803(2); and (2) the statement was testimonial, and its admission violated the Sixth Amendment because defendant was given no opportunity at trial to confront the declarant, Justin K. We conclude that, although admitting the statement was error, it was harmless beyond a reasonable doubt.

¶ 9. We first consider defendant's argument that the statement was not an excited utterance within the meaning of Rule 803(2). Our review of trial court evidentiary rulings is deferential, and we reverse only when there is an abuse of discretion resulting in prejudice. *State v. Desautels*, 2006 VT 84, ¶ 12, 180 Vt. 189, 908 A.2d 463. In order to be admitted as an excited utterance, a hearsay statement must "relat[e] to a startling event or condition [and be] made while the declarant was under the stress of excitement caused by the event or condition." V.R.E. 803(2). A statement need not be made immediately after the startling event in order to qualify. *State v. Shaw*, 149 Vt. 275, 281, 542 A.2d 1106, 1109 (1987). The key inquiry is into "the condition of the declarant." *Id.* No statement may be admitted under the exception unless the declarant's excitement is shown to have been caused by the startling event. *State v. Lemay*, 2006 VT 76, ¶ 9, 180 Vt. 133, 908 A.2d 430.

¶ 10. At the time of Justin K.'s statement to the police, he was described as "[f]lummoxed" and "all anxious . . . hollering that, you know, somebody had come into the house and pointed a gun at him." As Justin never testified at trial, this statement by the police officer is the only direct evidence of Justin's condition at the time of his statement. The police officer also testified that before making the statement Justin had left the apartment, gone to the store down the block, and returned to the apartment. Upon his return, he told the officer "I know what's going on here, I'll tell you. I gotta talk to you." Defendant contends, based principally on this prefatory statement, that the declarant's description of the events in the apartment was a product of reflection, and not

a natural statement arising out of the event. We agree that it was error to admit the statement under the excited-utterance exception.

¶ 11. The facts here are different from those in the cases where we have allowed an excited utterance despite the passage of time between the precipitating incident and the statement about it. In *Shaw*, for example, we held that the trial court did not err by admitting a statement made by a sexual-assault victim more than two hours after the assault, where the evidence established that the victim was "shaking, pale . . . hysterical . . . crying and trembling" as she recounted the assault to her neighbors. 149 Vt. at 280, 542 A.2d at 1109. At the time she made the statement, the victim in *Shaw* had just learned that her assailant had returned to the nearby apartment where the assault took place; upon learning of his return, she "huddled in a ball on the floor, crying and screaming hysterically, 'don't let him in.' " *Id.* After being coaxed to stand up, she told the neighbors she had been sexually assaulted.

¶ 12. Similarly, in *State v. Ayers*, 148 Vt. 421, 423-24, 535 A.2d 330, 331-32 (1987), we upheld the trial court's admission of a hearsay statement made after the declarant ran into a police station following an incident in which her husband rammed her car with his and attempted to block her from driving into the station parking lot.

¶ 13. Here, by contrast, Justin left the apartment and went down the block to the store, returning to give his narrative to the police, who had arrived in the interim. His statement, as recounted by the police officer, came after a prefatory statement that evinces a measure of reflective thought different from that present in *Shaw* and *Ayers*. Further, the trial court made no factual findings on which to base its conclusion that the statement fit within the bounds of the excited-utterance exception. Admitting the statement as an excited utterance was error, but we will not reverse if it was harmless beyond a reasonable doubt. See *State v. Brochu*, 2008 VT 21, ¶ 55, 183 Vt. 269, 949 A.2d 1035.

¶ 14. Here, we conclude beyond a reasonable doubt that admitting the statement was harmless. Officer Helrich's account of Justin's statements outside the apartment was cumulative to the testimony of Jodie S., who testified at trial. Officer Helrich's testimony on this point was, in its entirety, as follows:

And then [Justin] comes up and tells us that he, and [Jodie], and Joanne are on the couch and [there is a] knock at the door, and . . . Joanne gets up, I believe, he said, and that she goes to the door and says, Who is it? And the guy identifies himself as Matt. So, she opens the door. They see that Matt goes off to the side and these two black men come in, as they described them, say, Who's Justin? Where's Justin? [Justin K.] says, I'm Justin. So, one of the taller of the two gentlemen that come in, points a gun at him and says, You're Justin? . . . And then he says, Justin Finnegan? And Justin says, No, Justin [K.]

¶ 15. Jodie S. testified that he, Justin, and Joanne were seated on the couch in Jodie's apartment when Matt M. knocked on the door. Joanne answered the door, and two black men came through the door, asking for "Justin." One had a gun, which he pointed first at Jodie and eventually at Justin. When the men realized that the Justin they were looking for was not in the apartment, they left.

¶ 16. The defense contends that Justin K.'s statement was critical to the State's ability to establish that defendant intended to place Justin in fear of harm, as the assault-by-menace charge requires. See 13 V.S.A. § 1023(a) ("A person is guilty of simple assault if he: . . . (3) attempts by physical menace to put another in fear of imminent serious bodily injury."). But Justin's testimony was not necessary to establish any element of the crime. The State did not need to prove that defendant *actually* placed Justin in fear of injury, but only that defendant had attempted to do so. The hearsay testimony was cumulative to Jodie's testimony, and we have no doubt that the outcome of the trial would have been the same without it. See *State v. Burgess*, 2007 VT 18, ¶ 9, 181 Vt. 336, 917 A.2d 528 (reasoning that, if wrongly admitted evidence is cumulative, error is harmless beyond a reasonable doubt). Thus, we will not reverse on that basis.

¶ 17. We now turn to defendant's Confrontation-Clause argument. The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify,

and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). As the high Court recently noted in *Davis v. Washington*, "[o]nly [testimonial] statements . . . cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." 547 U.S. 813, 821 (2006).

¶ 18. We will uphold a conviction despite a Confrontation Clause error "if we find that the error was harmless *beyond a reasonable doubt.*" *State v. Lipka*, 174 Vt. 377, 384, 817 A.2d 27, 33 (2002). Our harmless-error analysis posits a trial without the disputed evidence. *State v. Lynds*, 158 Vt. 37, 42, 605 A.2d 501, 503 (1991). If there is no reasonable doubt that the outcome of the trial would have been the same without the evidence, we will not reverse. *Id.*

■ ¶ 19. As discussed above, we are confident that Justin K.'s statement to the officer was not prejudicial, and conclude beyond a reasonable doubt that the outcome of the trial would have been the same without the disputed evidence. Accordingly, we do not decide whether the statement was testimonial or nontestimonial. See *In re Sealed Documents*, 172 Vt. 152, 156, 772 A.2d 518, 523 (2001) (noting this Court's "tradition of addressing issues of constitutional significance only when the matter is squarely and necessarily presented").

## IV. The kidnapping conviction

¶ 20. Defendant's next claim of error is that the trial court erred in denying his motion for judgment of acquittal because the evidence at trial did not establish the intent to restrain necessary to support a kidnapping conviction. See 13 V.S.A. § 2405(a). This claim, however, was not raised at trial, and is accordingly not preserved for our review. See *State v. Winters*, 136 Vt. 469, 470, 392 A.2d 429, 430 (1978) ("[W]here the claim of insufficiency of the evidence to support the charge is not presented to the lower court at the end of the trial by a motion under the rule for judgment of acquittal, the issue is not preserved for appellate review." (citation omitted)).

¶ 21. After the jury verdict below, defendant moved for a judgment of acquittal, asserting only that "[t]he evidence pre-sented at trial was insufficient to establish the element of *intent* necessary to support a conviction for kidnapping as a matter of

law." Nowhere in the motion is there any language challenging the element of *restraint*, which defendant seeks to challenge on this appeal. Indeed, defendant's motion explicitly, and repeatedly, conceded the element of restraint. Among other explicit concessions, defendant stated: "Taking the evidence in the light most favorable to the State, the kidnappers physically restrained [Matt M.] with an arm and later a belt around his neck." Defendant went on to concede that he "physically restrained Matt M.," that the presence of the gun "continued the restraint," and that "the restraint was oppressive" but was "incidental to the demands for money and had no purpose other than obtaining money." Defendant then cited *State v. Goodhue* and contended that the analysis therein was relevant *in spite of the fact* that *Goodhue* was about the element of restraint. 2003 VT 85, ¶ 3, 175 Vt. 457, 833 A.2d 861. We therefore do not consider defendant's challenge to the sufficiency of the restraint evidence.

■ ¶ 22. Defendant did, however, preserve for our review the related claim that the restraint was incidental to simple assault or extortion, and that one of those less serious crimes should have been charged instead of kidnapping. See *State v. Synnott*, 2005 VT 19, ¶ 19, 178 Vt. 66, 872 A.2d 874 (evaluating similar question); *Goodhue*, 2003 VT 85, ¶ 16 (same). To determine whether kidnapping or unlawful restraint may be charged as a separate offense, we consider whether "the confinement, movement, or detention was merely incidental to the accompanying felony or whether it was significant enough, in and of itself, to warrant independent prosecution." *Goodhue*, 2003 VT 85, ¶ 16. We consider several factors:

> whether evidence of the seizure, detention, or movement was or was not inherent in the nature of the underlying crimes; whether the crime was facilitated by the confinement; whether the movement or confinement prevented the victim from summoning assistance; whether the movement or detention lessened the defendant's risk of detection; and whether the movement or detention created a significant danger or increased the victim's risk of harm.

*Id.* ¶ 13.

¶ 23. Defendant argues that the detention here was incidental to an assault or extortion, and that neither was facilitated by the

detention. Defendant also contends that the detention did not prevent Matt from summoning assistance, that "any avoidance of detection was shortlived," and that the fact that Matt was in a car neither created a significant danger nor increased his risk of harm.

¶ 24. Matt was confined in the car for about an hour while being driven from Burlington out to the beltway, onto the Interstate, to the Milton exit, and back to Burlington via Winooski. During that time he was choked by hand and with a belt, threatened with mace, blindfolded with a hat, and had a gun pointed at his head. Matt testified that he concocted the story about "Justin Finnegan" having the money because he "knew that was [his] only escape." Defendant's contention that all of these events were merely incidental to the efforts to obtain the money is unconvincing. This is not a case where "some confinement or asportation occur[red] as a subsidiary incident" to a lesser crime. *Goodhue*, 2003 VT 85, ¶ 12.

¶ 25. The asportation ten miles outside of Burlington was not an essential element or a "subsidiary incident" of either assault or extortion. Either may be committed without placing the victim in a car and driving him around for nearly an hour. Cf. *Synnott*, 2005 VT 19, ¶ 20 (confinement of lewd-and-lascivious-conduct victim for one and one-half hours while intermittently fondling her was not incidental to lewd and lascivious conduct itself). Although such cases do not lend themselves to a fixed calculus, it is instructive to note that our research reveals no case, and defendant has cited none, in which a detention and asportation similar to this has been held *not* to support a separate kidnapping charge. Instead, we find cases virtually too numerous to list in which asportations far shorter in both time and distance have been held to support a kidnapping conviction. See, e.g., *State v. Carrasquillo*, 173 Vt. 557, 561, 795 A.2d 1141, 1146 (2002) (mem.) (restraining victim for two to ten minutes is not inherent component of escape attempt, and caused increase in danger to victim); *State v. Dixon*, 957 S.W.2d 532, 535 (Tenn. 1997) (dragging victim thirty to forty feet was not incidental to sexual battery; asportation increased the risk of harm and decreased chance of detection); *In re Earley*, 534 P.2d 721, 726-27 (Cal. 1975) (moving victim ten to thirteen city blocks not incidental to robbery).

¶ 26. Matt M. was also exposed to substantially greater risk of harm by virtue of the asportation. See *People v. Lara*, 528 P.2d

365, 369 (Cal. 1974) ("Clearly, any substantial asportation which involves forcible control of the robbery victim . . . exposes [the victim] to grave risks of harm to which [the victim] would not have been subject had the robbery occurred at the point of initial contact." (quotation omitted)). The array of increased risks is not limited to the obvious risks posed by the perpetrators themselves, but also includes "desperate attempts by the victim to extricate himself [and] unforeseen intervention by third parties." *Id.* at 369 n.4.

¶ 27. Notwithstanding defendant's conclusory assertion to the contrary, Matt was plainly less able to summon help while in the moving car with a belt around his neck than he was at the start of the encounter, when he was standing outside of a retail store on a city street. Similarly, the circuitous drive detailed above clearly helped defendant and his accomplice avoid detection.

¶ 28. The case defendant has cited, *Government of Virgin Islands v. Berry*, 604 F.2d 221 (3d Cir. 1979), is not to the contrary. In *Berry*, the victim was willingly driven around an island by robbers precisely so that he could find the money to repay a debt he conceded he owed them. In that case, the only detention that was arguably not incidental to the robbery was when the robbers — after the consensual drive failed to produce the money — drove to a nearby beach, brandished a gun, told the victim to strip and get in the water, took his clothes and wallet, and left him naked and penniless on the beach. *Id.* at 228. In *Berry*, the incident at the beach formed the sole basis for both the kidnapping and robbery charges. Our case is distinct from *Berry* on the facts, and its reasoning is inapposite. There was no error in denying the motion for judgment of acquittal on this basis.

## V. The unlawful-restraint conviction

¶ 29. Defendant next contends that the trial court committed plain error in failing to enter a judgment of acquittal on its own motion as to the unlawful-restraint conviction. Defendant's argument on this point is premised entirely on the claims made as to the kidnapping charge, which we have dispensed with *supra*, ¶¶ 20-28. There was no error, much less plain error, in the trial court's decision not to acquit on the unlawful-restraint charge.

## VI. Prosecutorial statements

¶ 30. Defendant would also have us find plain error in comments made by the prosecutor in his opening statement and his summation, to which defendant did not object at trial. Defendant first argues that the opening statement amounted to an improper expression of the prosecutor's personal belief or opinion as to the truth or falsity of testimony or the guilt of defendant. See *Ayers*, 148 Vt. at 425-26, 535 A.2d at 333 (collecting cases condemning prosecutorial statements indicating prosecutor's personal belief that the defendant is guilty). Defendant finds fault with the prosecutor's statement that: "The evidence, as it comes in, will convince you that [Matt] was telling the truth, [Jodie and Joanne] are telling the truth, and the defendant lied to [the police]."

¶ 31. As noted, defendant did not object to the statement at trial, and so must surmount the "significant barrier to reversal" that our plain-error standard entails. *Id.* at 425, 535 A.2d at 333. "We have rarely found plain error in prosecutor's arguments to the jury even where we have condemned the argument." *Id.* at 426, 535 A.2d at 333; cf. *State v. Rehkop*, 2006 VT 72, ¶ 38, 180 Vt. 228, 908 A.2d 488 (reversing conviction where prosecutor referred to evidence not in the record and said he would charge defense witnesses with perjury but for their claimed inability to remember the true facts). In considering whether admitting a statement was plain error, we require "a showing that the error strikes at the heart of defendant's constitutional rights or results in a miscarriage of justice." *Ayers*, 148 Vt. at 426, 535 A.2d at 333. We consider several factors: the frequency with which the improper argument was made, "whether the remark was inflammatory and attacked defendant's character, and whether the court gave curative instructions." *State v. Martel*, 164 Vt. 501, 506, 670 A.2d 845, 849 (1995) (citation omitted).

¶ 32. The remark complained of here was made only once, and was not inflammatory. The State contends, with some force, that the statement here was not vouching, in that it was not an expression of the prosecutor's personal opinion of the witnesses' veracity. Rather, the State argues, the prosecutor was simply asserting "that the evidence [would] convince the jury of the credibility of witnesses." We agree. See *State v. Messier*, 146 Vt. 145, 160, 499 A.2d 32, 43 (1985) (finding no plain error where prosecutor made six references, throughout trial, to what he

thought the jury would believe based on the evidence). The opening statement was not improper, and there was no plain error in admitting it.

¶ 33. We turn next to the prosecutor's statement, in closing, regarding Matt M.'s testimony:

> Again, this is not something he made up. This is not something he did on a lark. This is not something he decided to do because he couldn't get drugs from the defendant or defendants or contact [George, a cocaine dealer defendant knew].

Defendant argues that this statement runs afoul of *State v. Lapham*, in which we stated that "counsel should confine argument to the evidence of the case and inferences properly drawn from it, and must avoid appealing to the prejudice of the jury." 135 Vt. 393, 406, 377 A.2d 249, 257 (1977). Defendant's contention is that this statement amounted to an impermissible implication that defendant was connected with drug dealers or was himself a dealer, and that the statement therefore violates the rule announced in *Lapham*.

¶ 34. Counsel's statement does not offend *Lapham*. The statement quoted above does not connect defendant to drugs or drug-dealing any more firmly than defendant's own testimony concerning his knowledge of drug dealing and drug dealers. Indeed, the statement implies only that Matt M. might have tried *and failed* to get drugs from defendant. Moreover, it is plain from the record that the prosecutor's mention of the purported cocaine dealer was intended only to rebut *defendant's* claim that Matt made up his story because he was angry that he *couldn't* get drugs from defendant. This is not the stuff of plain error.[*]

¶ 35. Defendant also objects to the following statement, which the prosecutor made in closing argument:

> According to [defendant], [defendant] was supposed to be setting up some kind of drug deal, and I'll get into whether that makes any sense in a minute. But he's supposed to be setting up some kind of drug deal that

---

[*] Nor does the prosecutor's mention of other "defendants" when there were none rise to the level of plain error.

never, never, consummated — probably the wrong word. Never worked.

Defendant argues that there was no testimony from defendant that he was setting up a drug deal, and that no such inference could reasonably be made from his testimony. We disagree.

¶ 36. Defendant's testimony amply supported an inference that he was setting up a drug deal between Matt and George. Defendant testified as follows on direct examination by his attorney:

> Q: Do you know what [George] does for a living?
>
> A: Yeah.
>
> Q: What does he do?
>
> A: He's [a] drug dealer.
>
> Q: What does he deal in? Marijuana? What?
>
> A: Cocaine.
>
> . . . .
>
> Q: All right. On this day did you agree to put [Matt] in touch with [George]?
>
> A: Yeah.
>
> Q: When you did, if you managed to put them in touch, what were you guessing was gonna happen?
>
> A: Pretty much that [Matt] was gonna get stuff from [George].
>
> Q: So did you think you were actually helping [George] make a drug sale?
>
> A: No.

It is no impermissible inferential leap from this testimony to the conclusion that defendant was "setting up" a drug deal. Defendant's mere assertion that he did not think he was "actually helping [George] make a drug sale" does not persuade us otherwise, particularly in light of his contemporaneous concession that he was "put[ting] them in touch" so that Matt M. could "get stuff from [George]."

## VII. Cumulative errors

¶ 37. Finally, defendant argues that the asserted errors, even if not serious enough to warrant reversal on their own, have a cumulative effect so prejudicial as to require reversal. See *State v. Aiken*, 2004 VT 96, ¶ 9, 177 Vt. 566, 862 A.2d 285 (mem.). For the reasons detailed above, we disagree.

*Affirmed.*