NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2022 VT 25

No. 2020-262

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Criminal Division |
| | |
| Jayveon E. Caballero | January Term, 2022 |

Mary L. Morrissey, J.

Thomas J. Donovan, Jr., Attorney General, and John D.G. Waszak, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Dawn Seibert, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Johnson, J. (Ret.), Specially Assigned

¶ 1.     **REIBER, C.J.**   Defendant Jayveon Caballero was convicted by a jury of second-degree murder. On appeal, he argues that the State presented insufficient evidence to prove that he acted intentionally or in knowing disregard of a deadly risk to the victim when he fired a gun into the victim's car. He also claims that the trial court deprived him of a fair trial by excluding a statement of remorse that he made to his cousin three hours after the shooting. Finally, he contends that the verdict must be reversed because the State showed three graphic crime scene photographs to the jury that were not admitted into evidence. We conclude that there was adequate evidence

of intent to support the verdict and that the alleged evidentiary errors do not require reversal. We therefore affirm.

## I. Facts

¶ 2.    The following evidence was presented at trial. On the evening of January 21, 2017, defendant was with friends at a bar in Barre, Vermont. The victim, Markus Austin, was also at the bar with a group of friends. After the bar closed around 2:00 a.m., a fight broke out in the parking lot between the two groups. Defendant and the victim got into a heated verbal interaction. Defendant's girlfriend attempted to intervene. The victim swore at defendant's girlfriend and called her a derogatory name, so she hit him. The victim punched her in the face, fracturing her jaw, and she fell to the ground. Someone in the group began waving a gun, and everyone scattered.

¶ 3.    Defendant and another couple went with defendant's girlfriend to the hospital to obtain treatment for her injuries. Her mouth was bleeding and she could not speak or move her jaw. While in the car, defendant repeatedly vowed revenge, stating, "I can't believe he just hit you, I really hope he didn't break your jaw; if he did, I'm going to fucking kill him. I can't believe this happened." After they arrived at the hospital, defendant texted and called one of the victim's friends, who had been present at the bar. Defendant asked where the victim was, warned the friend that "it wasn't over," and told him to "[s]trap up."

¶ 4.    Shortly before 4:00 a.m., defendant and the other couple left the hospital and went back to the couple's apartment in Barre. Around this time, defendant texted another friend to notify the friend how to find defendant's bail money. After dropping off his friends, defendant drove to his apartment and obtained a handgun. He then drove to the parking lot of the apartment complex in Montpelier where the victim lived.

¶ 5.    A security camera in the laundry room of the victim's apartment complex was pointed toward a window through which part of the parking lot could be seen. The video recording

2

from the camera showed that at 4:25 a.m., a car entered the parking lot.[1]  A second car entered the lot a few minutes after the first car.  The second car came to an abrupt stop in front of the window.  Seconds later, something resembling a puff of smoke appeared near the front passenger side of the second car, and seconds after that, the left turn signal on the car activated.  Less than a minute later, a person approached the front of the car, then retreated.  A car then drove past the second car toward the parking lot exit.

¶ 6.     A neighbor in the apartment complex testified that he was in bed trying to sleep when he heard a voice yelling outside his window, "what the hell, n-----, what the hell, n-----."  After the second yell, he heard a shot.  He looked out his window and saw a person, whom he later identified as defendant, standing by the driver's side of a car holding a gun.  Defendant lowered the gun and began walking toward the victim's car.  Defendant asked the victim if he was all right, then ran back to his car and drove away fast.  The neighbor called 911 and went down to check on the victim, whom he recognized as the victim.  The victim had blood coming out of his mouth.

¶ 7.     A Montpelier Police Department officer was the first to respond to the scene.  He spoke briefly with the neighbor, then went to the parking lot.  He observed a dark-colored sedan.  The car's engine was running, the rear taillights were on, and the left turn signal was activated.  The driver's-side door was open, and the victim was lying face down near the door.  The officer observed blood around the victim's head and feet.  He felt the victim's pulse and realized that the victim was dead.

¶ 8.     While waiting for paramedics and other law enforcement to arrive, the officer took a video and photographs of the scene, then began to look for evidence.  Walking around the car, he observed a black plastic lighter and a nine-millimeter bullet casing.  He noticed what appeared to be a bullet hole in the windshield near the A-pillar on the passenger side of the car.  He also

---

[1]  Testimony at trial established that the security video timestamp was ahead by one hour and seventeen minutes.

observed a bullet fragment on the driver's-side passenger floorboard. There were fragments of glass and glass powder on the exterior of the car under the windshield wipers and on the dashboard and interior of the car.

¶ 9. The Vermont State Police (VSP) Crime Scene Search Team subsequently arrived and continued the investigation. In addition to the items observed by the first police officer, the VSP team retrieved a partially smoked cigarette butt near the victim's car, which DNA testing later showed to have been smoked by defendant.

¶ 10. The VSP investigation determined that the hole in the victim's windshield was approximately forty-two inches from the ground. The roof of the car was fifty-two inches from the ground. The VSP lieutenant who led the crime scene investigation concluded, based on the oblong shape of the defect created in the windshield by the bullet, that the bullet had entered at an angle. He further opined that the bullet had traveled in a fairly level trajectory.

¶ 11. Based on the shape of the bullet hole, the V-shaped space on the driver's seat that had no glass fragments, and the pattern of blood found inside and outside the car, the VSP lieutenant concluded that the victim had been sitting in the driver's seat when he was shot. He then attempted to get out of the car, collapsed, and died. The lieutenant opined that the shooter was positioned diagonally to the front passenger side of the victim's vehicle. The lieutenant testified that his conclusion was consistent with the autopsy report, which showed that the bullet entered the right side of the victim's chest and traveled slightly downward and to the left.

¶ 12. A medical examiner testified that the bullet entered the victim's chest slightly to the right of center and just below his collarbone, perforated his aorta, and lodged against his spine. The wound indicated that the bullet traveled almost horizontally through the victim's chest. A ballistics analyst who examined the bullet and casing testified that when a bullet hits a windshield at an angle there will be some deflection, but it will remain on the same general trajectory.

4

¶ 13. After the shooting, defendant went to a friend's house in Barre, where his girlfriend joined him. Defendant was upset and crying and kept saying, "I fucked up." He told his girlfriend that he had not aimed at the victim. Later that day, defendant fled Vermont. In May 2017, he was apprehended by federal marshals in Florida.

¶ 14. The State initially charged defendant with second-degree murder and later amended the charge to first-degree murder. A seven-day jury trial was held in November 2019. After the State finished presenting evidence, defendant moved for judgment of acquittal, but asked the court to reserve its ruling until after the jury entered a verdict. Defendant did not present any evidence. The jury found defendant guilty of the lesser charge of second-degree murder.

¶ 15. Defendant renewed his motion for judgment of acquittal after trial, arguing that there was insufficient evidence that he had the requisite intent for second-degree murder. The court denied the motion, concluding that it was undisputed that defendant fired the bullet that killed the victim and was not acting in self-defense or defense of others, and that there was sufficient evidence for the jury to find beyond a reasonable doubt that defendant either intended to kill the victim or acted with a wanton disregard of the likelihood that death or great bodily harm would result from his actions. It subsequently sentenced defendant to serve twenty-five years to life. This automatic appeal followed. See V.R.A.P. 3(b)(2).

II. Denial of Motion for Judgment of Acquittal

¶ 16. Defendant's primary argument on appeal is that the trial court erred in denying his motion for judgment of acquittal because the State failed to present sufficient evidence to prove beyond a reasonable doubt that defendant had the requisite intent for second-degree murder. We conclude that the record contained ample evidence to support the conviction.

¶ 17. We review the denial of a motion for judgment of acquittal without deference to the decision below. State v. Berard, 2019 VT 65, ¶ 7, 211 Vt. 39, 220 A.3d 759. We consider whether the evidence presented, taken in the light most favorable to the State and without

considering any modifying evidence, is sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty. State v. O'Dell, 2007 VT 34, ¶ 4, 181 Vt. 475, 924 A.2d 87. Because "[the] jury is in the best position to weigh facts and deliver a verdict, particularly in close fact-dependent cases," a judgment of acquittal is appropriate "only when there is no evidence to support a guilty verdict." State v. Cameron, 2016 VT 134, ¶ 5, 204 Vt. 52, 163 A.3d 545.

¶ 18.   The crime of second-degree murder requires proof of "an intention to kill, an intention to do great bodily harm, or a wanton disregard of the likelihood that one's behavior may naturally cause death or great bodily harm." State v. Hatcher, 167 Vt. 338, 344, 706 A.2d 429, 433 (1997) (quotation omitted); see also 13 V.S.A. § 2301 (stating that murder not committed "by means of poison, or by lying in wait, or by willful, deliberate, and premeditated killing, or . . . in perpetrating or attempting to perpetrate arson, sexual assault, aggravated sexual assault, kidnapping, robbery, or burglary" is murder in second degree). The mental element of second-degree murder is satisfied when the evidence is such that the jury could reasonably find "that defendant had at least the mental state of wantonness." State v. Baird, 2017 VT 78, ¶ 13, 205 Vt. 364, 175 A.3d 493. Wantonness means "extremely reckless conduct that disregards the probable consequence of taking human life." State v. Shabazz, 169 Vt. 448, 455, 739 A.2d 666, 670 (1999) (emphasis omitted). "To be convicted of second-degree murder based upon wanton conduct, there must be evidence that the defendant was aware of the deadly risk posed to human life from his or her actions." Baird, 2017 VT 78, ¶ 13; see also State v. Brunell, 159 Vt. 1, 7, 615 A.2d 127, 130-31 (1992) (explaining that difference between second-degree murder and involuntary manslaughter is defendant's subjective awareness of risk to victim). The requisite intent may be inferred from the defendant's acts as well as circumstantial evidence. See State v. Bourgoin, 2021 VT 15, ¶ 8, __ Vt. __, 254 A.3d 217 (noting that direct evidence of intent is rare).

¶ 19.   When assessing circumstantial evidence, the jury "may draw rational inferences to determine whether disputed ultimate facts occurred." State v. Durenleau, 163 Vt. 8, 12, 652 A.2d

6

981, 983 (1994). "The State is not required to exclude every reasonable hypothesis of innocence in proving a case with circumstantial evidence." State v. Warner, 151 Vt. 469, 472, 560 A.2d 385, 387 (1989). "The evidence and inferences, however, must add up to more than mere suspicion; the jury cannot bridge evidentiary gaps with speculation." Durenleau, 163 Vt. at 12-13, 652 A.2d at 983.

¶ 20. Defendant argues that the State presented insufficient evidence for the jury to find that defendant was aware of and knowingly disregarded a deadly risk to the victim. He argues that at trial, the State's theory was that defendant intentionally killed the victim, which required the jury to infer that the victim was in his car and defendant shot a bullet directly at him. He claims that the State's theory is inconsistent with the neighbor's testimony that he saw defendant lower the gun after the shooting, so the jury could not have reasonably inferred that defendant shot straight at the victim. Defendant also argues that the State's theory is inconsistent with the testimony of the crime scene investigator and the medical examiner that no glass was found on the victim. He argues that if the victim were in his car, there would necessarily be glass on him. Under these circumstances, defendant contends that the jury could not reasonably infer that he knowingly disregarded a deadly risk when he fired the gun toward the victim's car.

¶ 21. We conclude that there was sufficient evidence for the jury to conclude beyond a reasonable doubt that defendant acted, at the very least, in wanton disregard of a deadly risk to the victim. The security footage from the laundry room camera provided compelling evidence of the sequence of events. It showed a car travel by at around 4:25 a.m., which the jury could reasonably infer was defendant's car. A few minutes later, the victim's car came to a sudden stop in front of the window. Four to five seconds later, a cloud of material—likely glass powder created by the bullet entering the windshield—appeared near the front passenger side of the victim's car. Approximately five seconds after that, the car's left turn signal activated. The victim was found lying face down with his feet inches from the open driver's side door. The responding police

7

officer testified that the car was still running and in neutral gear when he arrived, suggesting that the victim saw something that made him suddenly stop and that he did not have time to park the car. The jury could rationally infer from this evidence that the victim was in the driver's seat while he was driving, that he was still seated when defendant fired the shot into the car four or five seconds later, and that the victim activated the left turn signal as he stumbled or fell out of the car.

¶ 22. Furthermore, the VSP lieutenant opined, based on the shape of the bullet hole, the pattern of glass on the driver's seat, and the pattern of blood found inside and outside the car, that the victim had been sitting in the driver's seat and was turned slightly toward the passenger side when he was shot. This opinion was corroborated by the autopsy report, which showed that the bullet entered the right side of the victim's chest and traveled slightly downward and to the left. It was also corroborated by the testimony of the victim's neighbor and evidence found at the scene, which indicated that defendant was standing diagonal to the front of the passenger side of the victim's car when he fired the shot.

¶ 23. Defendant's acts of preparation further support a reasonable inference that defendant had the requisite mental state for second-degree murder. After the altercation at the bar, defendant repeatedly stated that he was going to kill the victim. He left his friends and went to get a loaded gun. He drove to the victim's apartment building, parked facing out so that he could see cars entering the parking lot, and waited for the victim. Meanwhile, he informed a friend by text message where the friend could find his bail money, indicating that he knew he would be unable to get it himself after he did whatever he was intending to do. This record supports the jury's finding that defendant either intended to seriously harm the victim or acted in wanton disregard of the likelihood that the victim could be killed or suffer serious bodily harm.

¶ 24. Defendant acknowledges that he repeatedly threatened to kill the victim, borrowed a gun, waited for the victim at his home, and fired a shot at the victim's windshield that ultimately killed the victim. Defendant claims, however, that the evidence tends to show that he was merely

8

firing a warning shot and did not aim directly at the victim, and therefore did not knowingly disregard a deadly risk. We disagree. "When the circumstances are such that the defendant must have been aware of his actions, the evidence—whether direct or circumstantial—is sufficient to raise an inference of knowledge and withstand a motion for a judgment of acquittal." Bourgoin, 2021 VT 15, ¶ 10 (quotation omitted). Whether he aimed directly at the victim or not, defendant concedes that he deliberately fired the gun at the victim's front windshield. Firing a gun into the passenger compartment of an occupied vehicle is highly likely to pose a risk of death or serious bodily harm to a person inside the vehicle. The inherently dangerous act of intentionally shooting at the car while the victim was inside, coupled with defendant's prior statements that he was going to kill the victim, were sufficient to create a reasonable inference that he was subjectively aware of the deadly risk to the victim and consciously disregarded this risk.

¶ 25. Some of the evidence presented at trial, such as the lack of glass on the victim's clothing and the neighbor's testimony that he saw defendant lowering the gun, was arguably inconsistent with the State's theory about the relative positions of defendant and the victim.[2] However, the State only had to prove each element of the crime beyond a reasonable doubt, not each fact or piece of its theory. See Baird, 2006 VT 86, ¶ 13 ("When reviewing a case based largely on circumstantial evidence, the evidence must be considered together, not separately, even if defendant can explain each individual piece of evidence in a way that is inconsistent with guilt." (quotation omitted)); State v. Green, 126 Vt. 311, 313, 228 A.2d 792, 794 (1967) ("It is only when facts constitute an element of the crime itself that they must be proved beyond a reasonable

---

[2] Because the bullet did not shatter the windshield, there was not much broken glass. The pictures of the interior of the victim's car show a small amount of glass on the dashboard and what appears to be a few bits of glass on the driver's seat and the floor. The jury could have reasonably concluded that any glass on the victim's body was displaced when he fell face down on the ground. Similarly, the neighbor's testimony that he saw defendant lowering the gun is only somewhat indicative of the angle of the shot because the neighbor did not personally observe the position defendant was in when he fired. Defendant concedes that he deliberately fired toward the passenger side of the car's front windshield.

9

doubt."); see also State v. Warner, 151 Vt. 469, 472, 560 A.2d 385, 387 (1989) ("[T]he State is not required to exclude every reasonable hypothesis of innocence in proving a case with circumstantial evidence."). We disagree with defendant's claim that the evidence presented here, taken as a whole, gives equal support to a theory of guilt or innocence. There was ample evidence tending to show that defendant had the requisite intent for second-degree murder. The trial court properly denied his motion for judgment of acquittal.

### III. Evidentiary Issues

#### A. Exclusion of Excited Utterance

¶ 26. Defendant next argues that the trial court committed reversible error by excluding a statement made by defendant after the shooting that tended to show that he did not intend to kill the victim. We review the trial court's evidentiary rulings for abuse of discretion. State v. Kelley, 2016 VT 58, ¶ 19, 202 Vt. 174, 148 A.3d 191. We agree that the court applied the wrong legal standard in deciding whether to admit the evidence but conclude that the error was harmless.

¶ 27. Defendant and his cousin were close friends and lived together with their girlfriends. Defendant's cousin's girlfriend told police that defendant and his cousin had a phone conversation around 8:00 a.m. the morning of the shooting, during which defendant was crying. The cousin's girlfriend overheard defendant tell his cousin that he felt horrible and did not know what really happened in the parking lot. The State objected to introduction of this statement, arguing that it was hearsay. The court sustained the objection, concluding that the statement did not meet the excited-utterance exception to the hearsay rule because it was made too long after the shooting.

¶ 28. The hearsay rule "prohibits the admission of out-of-court statements offered to prove the truth of the matter asserted." Id. ¶ 25; see V.R.E. 801(c), 802. There is an exception to the hearsay rule for statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." V.R.E. 803(2). Such

10

statements are referred to as excited utterances. Id. "The underlying rationale for the exception lies in the assumption that a person's powers of reflection and fabrication will be suspended when [the person] is subject to the excitement of a startling event, and any utterances [the person] makes will be spontaneous and trustworthy." In re Est. of Peters, 171 Vt. 381, 391, 765 A.2d 468, 476 (2000).

¶ 29. As our case law and the Reporter's Notes to Rule 803(2) make clear, an excited utterance need not be contemporaneous with the startling event. See State v. Jackson, 2008 VT 71, ¶ 9, 184 Vt. 173, 956 A.2d 1126 ("A statement need not be made immediately after the startling event in order to qualify."); State v. Shaw, 149 Vt. 275, 281, 542 A.2d 1106, 1109 (1987) ("[C]ontemporaneousness with the exciting event is not required for statements to be admissible as excited utterances."); see also Reporter's Notes, V.R.E. 803 (explaining that unlike present-sense-impression exception, excited-utterance exception "relies on the exciting quality of the event"). Instead, the "key inquiry" governing admissibility is the declarant's excited condition, which must be caused by the startling event. Kelley, 2016 VT 58, ¶ 25. For example, in State v. Shaw we affirmed the application of the excited-utterance exception to statements made by the complainant in a sexual-assault case to her neighbors two or three hours after the event where the neighbors testified that the complainant was "shaking, pale, and hysterical," and cried and trembled as she told them about the attack, because this evidence showed that the complainant was still under the stress of the exciting event. 149 Vt. at 279-80, 542 A.2d at 1108-09.

¶ 30. The trial court in this case concluded that defendant's statement to his cousin did not qualify as an excited utterance because the statement was made hours after the shooting, reasoning that "the whole idea of excited utterances is there's no time to reflect." This was error because the court focused solely on the timing of the statement. The court instead should have considered whether defendant "provide[d] sufficient evidence for a preliminary determination that the declarant was still gripped by the exciting event." State v. Verrinder, 161 Vt. 250, 257, 637

11

A.2d 1382, 1387 (1993). While timing was relevant to this inquiry, it was not necessarily determinative. See id. at 258, 637 A.2d at 1387 (affirming exclusion of defendant's statement of remorse because exclusion was based on lapse of time between event and utterance, lack of foundation showing that defendant was under stress of excitement, and finding that content of statement showed contemplation). The court applied the wrong legal standard and therefore abused its discretion. See In re Essex Search Warrants, 2012 VT 92, ¶ 14, 192 Vt. 559, 60 A.3d 707 ("When a trial court commits an error of law, it is an abuse of discretion." (quotation omitted)); Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) (noting that trial court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law").

¶ 31. Defendant argues that the error requires reversal of the verdict because the excluded statement would have provided crucial support for his version of events, which was that he fired a warning shot and was genuinely shocked and devastated when the bullet deflected and fatally struck the victim. He argues that the statement demonstrated that he did not intend to hit the victim, and that its exclusion deprived him of his due process right to present a defense. The State contends that the error was harmless because the excluded statement was cumulative to other testimony that was admitted.

¶ 32. "For an error to be harmless, this Court must find beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the error." State v. Larkin, 2018 VT 16, ¶ 22, 206 Vt. 535, 183 A.3d 589 (quotation omitted); see V.R.Cr.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). In assessing this question, we consider the strength of the State's case without the excluded evidence and the strength of the excluded evidence. State v. Haskins, 2016 VT 79, ¶ 17, 202 Vt. 461, 150 A.3d 202.

¶ 33. As discussed above, the State presented ample evidence to demonstrate that, even if defendant did not intend to kill the victim, he acted in wanton disregard of the likelihood that

12

the victim could be killed or severely injured when he fired the gun into the car where the victim was seated. In contrast, the excluded statement—that, three hours after the shooting, defendant "felt horrible and didn't really know what happened"—was not obviously exculpatory. It did not indicate that someone else was to blame or give defendant an alibi. Cf. Chambers v. Mississippi, 410 U.S. 284, 302 (1973) (holding that application of hearsay rule to exclude statements made by third party to three other individuals confessing to murder with which defendant was charged deprived defendant of fair trial under Due Process Clause). While the statement is somewhat supportive of the defense's claim that defendant did not specifically intend to kill the victim when he fired the gun, and therefore might have undercut the prosecution's theory of premeditated murder, the jury acquitted defendant of that charge. See State v. Charbonneau, 2009 VT 86, ¶ 16, 186 Vt. 583, 980 A.2d 279 (holding any error with regard to admission of testimony regarding "cycle of violence" in domestic-assault cases was harmless because it was primarily relevant to domestic-assault charge of which defendant was ultimately acquitted). The statement was not probative of whether defendant knowingly disregarded a deadly risk to the victim, the minimum intent required for second-degree murder.

¶ 34. Furthermore, defendant was able to elicit similar evidence during cross-examination of his former girlfriend. See Haskins, 2016 VT 79, ¶ 28 (explaining that in considering strength of excluded evidence, court may consider "whether it was cumulative or duplicative of other evidence" (quotation omitted)). Defendant's girlfriend testified that after the shooting, defendant was crying and kept saying, "I fucked up" and that "he wasn't sure if he hit him" and "he didn't aim for him." She also testified that defendant told her that the victim got out of the car and started screaming at him, that he shot at the car just to scare the victim, and that he did not see the victim but thought that the victim had ran around the back of his car. She further testified that once she moved down to Florida with defendant, he looked "[i]ll, sick, malnourished," "pale," "skinny," and "unkempt." Given the minimally probative nature of the

13

excluded statement and the similar testimony presented by defendant's girlfriend, we are unable to conclude that the jury would have returned a different verdict if the statement had been admitted.

¶ 35.    Defendant argues that he had to impeach his girlfriend with her prior sworn statement to make her admit that she told the police these things. He also argues that on re-direct, his girlfriend explained that defendant told her a lot of "different scenarios of what had happened that night," which left her with the impression that "he was trying to convince himself of it." He claims that her reluctant testimony was no substitute for his cousin's girlfriend's "straightforward" testimony about what he said a few hours after the shooting. However, the record shows that the cousin's girlfriend was also subpoenaed, and on direct examination, testified that she did not overhear anything when defendant's cousin was on the phone with defendant. On cross-examination, defense counsel had to impeach the cousin's girlfriend with her prior inconsistent statement to get her to agree that she had overheard defendant's conversation with his cousin. Because the two witnesses were fairly similar in terms of their attitude towards the defense, we are not persuaded that the admission of the cousin's girlfriend's similar testimony would have made a significantly different impact on the jury. For the same reason, we conclude that the exclusion of the statement did not deprive defendant of a fair trial.

B.  Publication of Crime Scene Photographs

¶ 36.    Defendant next claims that the jury's verdict must be reversed because the State published three unadmitted photographs of the victim's body to the jury. He argues that the photographs were so inflammatory that they likely prejudiced the jury against him. We disagree.

¶ 37.    Early in the trial, the State moved to admit approximately 100 photos of the crime scene. A discussion ensued during which the court asked whether every photograph was necessary, noting that some were quite graphic. The State eventually moved to admit all the photographs except for three labeled as State's exhibits 57, 58, and 59. These were never admitted into evidence. They were taken after crime scene investigators turned the victim's body over.

14

They depicted the victim's bloody face and body. His arms, hands, and fingers were bent into unnatural positions, showing that rigor mortis had set in.

¶ 38. Later in the trial, during the VSP lieutenant's testimony about the location and condition of the victim's body and the actions of the crime scene investigators, the prosecutor showed him exhibits 57, 58, and 59 and asked questions about them. The photographs were also shown to the jury. Defendant did not object or argue that the photographs should be excluded pursuant to Vermont Rule of Evidence 403.

¶ 39. On appeal, defendant argues that the jury's verdict must be reversed because the photographs were so gruesome that they likely prejudiced the jury against him. "Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to the jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or cause other reactions that would result in the jury basing its decision on something other than the established propositions of the case." State v. Little, 167 Vt. 577, 579, 705 A.2d 177, 180 (1997). "Only when this danger of unfair prejudice substantially outweighs probative value should the evidence be excluded." Id. (citing V.R.E. 403). Because defendant did not object when the photographs were displayed to the jury, we review for plain error. State v. Muhammad, 2007 VT 36, ¶ 10, 182 Vt. 556, 927 A.2d 769 (mem.). "When the admission of prejudicial evidence is claimed to be plain error, the appellant must show that the judgment below was substantially affected by its admission." State v. Laprade, 2008 VT 83, ¶ 23, 184 Vt. 251, 958 A.2d 1179.

¶ 40. We conclude that defendant has failed to meet this burden. First, the photographs were relevant to a disputed issue, namely, where the victim was located when defendant fired the shot. See Commonwealth v. Vazquez, 644 N.E.2d 978, 981 (Mass. 1995) (explaining that, in context of murder trial, "if the photographs possess evidential value on a material matter, they are not rendered inadmissible solely because they are gruesome or may have an inflammatory effect on the jury" (quotation omitted)). When the State showed the VSP lieutenant exhibit 57, the

lieutenant testified that he appeared to see glass on the victim's jacket. Defense counsel interjected, "[c]ould the witness identify the location of that glass?" The lieutenant zoomed in on the image to indicate where he had seen the glass. The State then showed exhibit 58. The lieutenant noted that he could see air bubbles in the blood near the victim's head as well as a dirt line on his pants, which he opined was consistent with "the back of his leg hitting the rocker panel of his car," tying that opinion to previous testimony and images regarding the rocker panel. He also explained his opinion that the blood around the victim showed that he was coughing up blood after he came out of the car. He testified that exhibit 59 was a close-up of exhibit 58. On cross-examination, defense counsel questioned the lieutenant about the sufficiency of the crime scene response and challenged the lieutenant's testimony that he observed some glass on victim. In his closing arguments, defense counsel argued that the lieutenant could have seen gravel, sand, or other debris on the victim's jacket and questioned his ability to identify glass: "If anyone tells you they can do that from a photograph, you shouldn't believe them." As discussed above, the victim's position at the time of the shooting was hotly contested. The three photographs were relevant to the State's theory that the victim was seated in the vehicle.

¶ 41. Further, defendant has failed to show that the photographs were unduly prejudicial. The photographs at issue here were not significantly more gruesome or offensive than other photographs that were admitted without objection. For example, State's exhibits 55 and 56 both show blood on the victim's face as well as rigor mortis in his hands. Other admitted photographs showed close-ups of the bullet wound in the victim's chest in which the victim's skin is visibly discolored. Defendant did not object to any of these other photographs. Given that this was a homicide case, we do not conclude that exhibits 57, 58, and 59 were needlessly or unduly inflammatory. See Little, 167 Vt. at 579, 705 A.2d at 180 (affirming trial court's denial of motion to exclude photographs of victim's body, facial wounds, and showing gun held next to victim's face in trial for second-degree murder because photographs were relevant to disputed issues and

16

did not rise to level of unfair prejudice). Defendant has therefore failed to show that their publication to the jury substantially affected the verdict.

## C. Cumulative Impact of Alleged Errors

¶ 42. Finally, defendant argues that even if the alleged evidentiary errors do not individually warrant reversal, the cumulative impact of the evidentiary errors denied him a fair trial. "The court may grant a new trial if it believes that the cumulative effect of numerous concerns, no one of which can be characterized as reversible error, amounted to a miscarriage of justice." State v. Aiken, 2004 VT 96, ¶ 9, 177 Vt. 566, 862 A.2d 285 (mem.). Because we conclude that none of the evidentiary issues discussed above prejudiced defendant, "there can be no resulting cumulative prejudicial effect." State v. Noyes, 2021 VT 50, ¶ 46, __ Vt. __, 260 A.3d 1132. We therefore affirm defendant's conviction.

Affirmed.

FOR THE COURT:

Chief Justice