NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 15

No. 23-AP-345

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Lamoille Unit, |
| | Criminal Division |
| | |
| Jay H. Orost | December Term, 2024 |

Michael J. Harris, J.

Evan Meenan, Deputy States's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Dawn Matthews, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT:  Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Toor, Supr. J. (Ret.), Specially Assigned

¶ 1.  **EATON, J.**  Defendant Jay Orost appeals jury convictions for sexual assault, lewd and lascivious conduct, and obstruction of justice. He argues that his convictions should be reversed because of jury irregularities, errors in evidentiary rulings, and misleading jury instructions. We affirm.

## I. Facts

¶ 2.  In September 2017, K.O., then seventeen, told her guidance counselor that her father, defendant Jay Orost had sexually assaulted her for the last seven years; starting when she was ten years old to as recently as the morning she reported the abuse. Following an investigation into the events, the State charged defendant with twelve counts including two

counts of sexual assault of K.O., two counts of aggravated repeated sexual assault of K.O, a count of aggravated domestic assault of K.O., and multiple counts of lewd and lascivious conduct perpetrated against K.O. and another minor, A.S. The State also charged defendant with obstruction of justice based on defendant's actions during the investigation. In January 2022, a jury found defendant guilty of all counts except aggravated domestic assault of K.O, and, instead, found him guilty of domestic assault, a lesser-included offense.

¶ 3. Defendant appeals his convictions and asks that this Court reverse and remand for a new trial. He argues that his Sixth Amendment right to an impartial jury was violated, that evidentiary rulings undermined his right to a fair trial, and that the jury instructions were flawed. As explained more fully below, we conclude that there was no error and affirm.[1]

## II. Right to an Impartial Jury

¶ 4. To understand the relevant issues raised by defendant concerning potential jury bias due to the jury-selection process, an explanation of defendant's relationship to his current wife and to K.O., one of the complainants, is necessary. In 1985, defendant married Lori Tinker (Pindell) and adopted her daughters, Katie and Kari. In 2000, defendant's adopted daughter,

---

[1] During the pendency of this appeal, defendant was represented by counsel from the Office of the Defender General. Notwithstanding his representation, defendant personally submitted numerous letters and motions with the Court alleging errors in the trial court proceedings and on appeal including alleged inadequacies with his representation by his assigned appellate counsel. As this Court previously ruled, defendant did not present good cause to replace his assigned counsel, who filed an appellate brief raising numerous issues and presented oral argument on defendant's behalf. To the extent defendant raised ineffective-assistance claims, they may not be presented in a direct appeal. See State v. Lund, 168 Vt. 102, 105, 718 A.2d 413, 415 (1998) (explaining that claim for ineffective assistance of counsel "must be raised, if at all, in the context of a petition for post-conviction relief"). Furthermore, because defendant was represented by counsel, we do not address the issues raised in the filings submitted without counsel. Although defendant is entitled to effective legal counsel, defendant "does not have an absolute right to both self-representation and the assistance of counsel." State v. Sims, 158 Vt. 173, 185, 608 A.2d 1149, 1156 (1991) (emphasis omitted) (quoting United States v. Halbert, 640 F.2d 1000, 1009 (9th Cir. 1981)). Moreover, when a litigant is represented by counsel, counsel must sign pleadings, and the filing sent to this Court by defendant did not include his attorney's signature. See V.R.A.P. 25(d)(1) (requiring counsel to sign document if party is represented by counsel).

Katie, gave birth to defendant's child, K.O., who is one of the complainants in this case. In 2004, defendant divorced Lori and married Katie. During the jury draw, defense counsel articulated his concern that a juror might "know[] the family dynamics" and "the whole story" and, consequently, be biased against defendant. On appeal, defendant argues that he was not afforded his constitutional right to an impartial jury because the trial court incorrectly concluded that two potential jurors were unbiased—despite indications that they might know or might be reminded of defendant's family and family history—and because the court declined defendant's request to make a particular juror (who had worked with a complaining witness) an alternate rather than a member of the final jury.

¶ 5. We begin with a description of the relevant events during the jury draw. When questioned, prospective juror Tilton indicated that he was "possibly [aware of defendant's] sister, Janice." Defense counsel later clarified to the court that, based on Mr. Tilton's answers and description of the woman, Mr. Tilton was likely indicating that he was aware of defendant's ex-wife, Lori—mother of his current wife—not defendant's sister. When asked directly about defendant's ex-wife, however, Mr. Tilton indicated some uncertainty: "Lori? I am trying to remember her name. Her maiden name, right?" But when asked whether he knew her connection to defendant, Mr. Tilton replied: "No. No." When asked if there was anything "which would impact your ability to be a fair juror," Mr. Tilton responded, "I don't believe so." Defense counsel subsequently requested a for-cause challenge against Mr. Tilton. The court declined to exclude the juror for cause, reasoning "I don't see where that potential juror has enough recollection of . . . anything of the family. This is twenty years ago, and he hasn't had ongoing knowledge. He couldn't remember the relationship or anything." Defense counsel then used a peremptory challenge for Mr. Tilton, stating "we feel we have no choice."

¶ 6. Prospective juror Billado worked at Global Foundries, defendant's former employer. During questioning, Mr. Billado indicated: defendant's name "[rang] a bell," he

3

remembered reading something about the case in the past, he assumed that his coworkers knew defendant, and he stated "my wife knows what the case is. And she said she knows [defendant] from . . . childhood, neighborhood-type stuff." However, even though his wife had discussed the case with him, Mr. Billado summarized his knowledge of the case, stating he had only "a foggy recollection of something going on in the past . . . I couldn't write a story and tell you what went on." When asked if he had any concerns that some of the evidence might trigger his memory of things his wife had said, Mr. Billado answered, "I guess I could say maybe." Mr. Billado also indicated in the affirmative that he was "the type [of person] that if you start hearing something, things will come back." Finally, when describing his ability to be impartial, especially considering the awkwardness of working with individuals who knew defendant, Mr. Billado stated that he "would like to think that I'd be fair no matter what." Following this questioning, defense counsel moved to exclude Mr. Billado for cause, arguing that there was a risk that Mr. Billado's coworkers might say something and that Mr. Billado might also start to recall information about the case once testimony started. Defense counsel argued that this created "an unnecessary risk under the circumstances." The court declined to exclude Mr. Billado for cause, stating that "it seemed to me he didn't have that much [information]." The court also assured that it would be "instructing people not to talk to the details with their spouse." Defense counsel then used a peremptory challenge for Mr. Billado.

¶ 7. After both parties exhausted their preemptory challenges, it became evident that two of the remaining jurors were related. Namely, juror Amiah Morse was juror Harold Morse's daughter-in-law. Both jurors affirmatively indicated that they would not be swayed or compelled by the other. Neither party asked to remove either of the Morses for cause. However, defense counsel requested more peremptory challenges stating that "there are two cause challenges that we made that were denied, so we'd use peremptories as to Mr. Tilton and Mr. Billado. And if I'd had another peremptory, I'd use it on either Mr. or Mrs. Morse out of concerns of them being

4

together." The court denied the request to allocate more peremptory challenges, upholding its previous decisions denying for-cause challenges for Mr. Tilton and Mr. Billado.

¶ 8. Finally, during the second day of trial, juror Cassidy wrote a note to the court stating that she might know one of the complainants. The letter read, "I think I may know [A.S.] . . . I think I met her and worked briefly with her . . . I don't know her well and I don't think it will affect my ability to be an impartial juror." Upon questioning by the court, Ms. Cassidy restated that "I think I can still be fair" and that if A.S. was who she remembered, "it wouldn't affect" her ability to be fair to the State and defendant. Defense counsel did not object to Ms. Cassidy continuing to sit on the jury. However, he asked that "come time for picking a panel, if there's still 13, we may request that she become the [alternate]." Defense counsel returned to the issue at the close of evidence and renewed the request that Ms. Cassidy be the alternate. The court subsequently declined to make Ms. Cassidy the alternate, stating "I don't see any reason to give her different treatment as the alternate." Instead, the court used a random selection process to choose the alternate and, through that process, selected a different juror as the alternate.

¶ 9. Defendant argues that the court violated his Sixth Amendment right to an impartial jury when it refused to dismiss Mr. Tilton and Mr. Billado for cause, which foreclosed his ability to use a peremptory challenge on one of the Morses. Defendant also argues that his right to an impartial jury was violated when the court refused to make Ms. Cassidy the alternate.

¶ 10. Under the U.S. and Vermont Constitutions, criminal defendants have a right to a trial by an impartial jury. The U.S. Constitution requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. Similarly, the Vermont Constitution mandates that "in all prosecutions for criminal offenses, a person hath a right to . . . a speedy public trial by an impartial jury." Vt. Const. ch. I,

5

art. 10. Trial courts "safeguard this right by excluding from the jury persons who evince bias against the defendant." State v. Sharrow, 2008 VT 24, ¶ 6, 183 Vt. 306, 949 A.2d 428.

¶ 11. This Court reviews trial courts' decisions during voir dire for abuse of discretion. State v. Bruno, 2012 VT 79, ¶ 30, 192 Vt. 515, 60 A.3d 610. "[T]here are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanelling of a jury." State v. Herrrick, 2011 VT 94, ¶ 17, 190 Vt. 292, 30 A.3d 1285 (quotation omitted). This deference arises from the rationale that "[t]he trial court is in a unique position to evaluate juror bias" and consequently, the "judge's determination in this regard is accorded great deference." Bruno, 2012 VT 79, ¶ 30 (quotation omitted).

¶ 12. "In Vermont, we recognize both actual (or fixed) bias and implied bias as proper grounds for challenges for cause." Sharrow, 2008 VT 24, ¶ 7. "A prospective juror has a fixed bias when, through his or her answers to questions posed on voir dire, the potential juror evinces a state of mind inconsistent with deciding the case fairly." Id. ¶ 8. Whereas "[i]mplied bias is bias conclusively presumed as a matter of law, which is attributed to a prospective juror regardless of actual partiality" and is inferred when "the prospective juror has such a close relationship with a participant in the trial—a witness, a victim, counsel, or a party—that the potential juror is presumed unable to be impartial." Id. ¶ 14 (quotation omitted). Defendant concedes that only the second category of bias is implicated here.

¶ 13. As we noted in Sharrow, "the doctrine of implied bias is reserved for exceptional situations in which objective circumstances cast concrete doubt on the impartiality of a juror." Id. ¶ 16 (quotation omitted). In this case, defendant argues that "there was a real risk that if either Mr. Billado's or Mr. Tilton's minds were jogged further by hearing from the witnesses, that either or both would recall further information about the family dynamics . . . that would be prejudicial to the defense case." This speculative concern expressed by defendant is not

6

sufficient to overcome a presumption of impartiality. The record indicates no relationship and certainly no relationship close enough between the potential jurors and defendant to overcome the presumption of impartiality. Cf. Turner v. Roman Cath. Diocese of Burlington, 2009 VT 101, ¶¶ 63-66, 186 Vt. 396, 987 A.2d 960 (describing issue as "quite close" but holding juror had implied bias where juror was member of relevant diocese); Jones v. Shea, 148 Vt. 307, 310, 532 A.2d 571, 573 (1987) (comparing ongoing doctor-patient relationship where there is "necessity for trust and confidence upon the part of the patient in his physician's judgment" and, therefore, implied bias, to former doctor-patient relationships where no bias can be implied (quotation omitted)). Therefore, the court did not abuse its discretion when it declined to remove jurors Tilton and Billado for cause.

¶ 14. In contrast to prospective jurors Tilton and Billado, juror Cassidy did indicate a past relationship with someone involved in the case, complainant A.S. Defendant argues that juror Cassidy should have been considered as an alternate and "ought to have been removed" because of this relationship. Defendant argues that "especially where the court was going to eliminate an alternate anyway. There was simply no reason to keep [juror Cassidy] on the jury."

¶ 15. The court used the appropriate method to designate the alternate juror. Vermont Rule of Criminal Procedure 24(f) requires that "[t]hose who are to be alternate jurors will be determined by random selection at the completion of the trial." This language requires random selection and does not allow the court to designate any specific juror as the alternate by reason of other concerns.

### III. Evidentiary Rulings

¶ 16. Vermont Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In addition, "[a]ll relevant evidence is admissible, except as limited by constitutional requirements or as otherwise

provided by statute or by these rules or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible." V.R.E. 402. Finally, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." V.R.E. 403.

¶ 17. "We review a trial court's evidentiary rulings for abuse of discretion." State v. Cameron, 2016 VT 134, ¶ 19, 204 Vt. 52, 163 A.3d 545. "[W]e will reverse [a trial court's] ruling only where that discretion was abused or withheld." State v. Amidon, 2018 VT 99, ¶ 20, 208 Vt. 360, 198 A.3d 27. Regarding Rule 403, "the trial court's discretionary ruling will be upheld where there is some indication . . . that the court actually engaged in the balancing test and exercised its discretion under V.R.E. 403." State v. Longley, 2007 VT 101, ¶ 18, 182 Vt. 452, 939 A.2d 1028 (quotation omitted). "The party challenging the court's rulings bears the burden to show that the trial court abused its discretion and absent such a showing, we will not disturb a reasonable discretionary ruling of the trial court, even if another court might have reached a different conclusion." State v. Parker, 2024 VT 64, ¶ 13, __Vt.__, 327 A.3d 875 (quotations and alterations omitted).

¶ 18. Defendant argues that multiple evidentiary rulings separately and cumulatively undermined his right to a fair trial. The challenged evidence includes: (1) an audio recording of a conversation between K.O. and police on the day she reported the abuse, (2) two different signed "contracts" between defendant and complainants K.O. and A.S. outlining restrictions on K.O.'s and A.S.'s sexual activities, (3) a prenuptial agreement between defendant and his second wife, Katie, (4) an array of photographs of K.O. and A.S. at various ages corresponding to the timeline of the various charged acts, and (5) a diagram of a vulva used during complainants' testimony to indicate where defendant touched them. We consider each item in turn.

8

A. Audio Recording

¶ 19. At trial, the State introduced an audio recording of the conversation between police officers and K.O. on the day she reported the abuse. Relevant to defendant's argument, K.O. sounds emotional and scared in the audio and states that wherever she goes, defendant will come and find her. Defendant argues on appeal that the audio should not have been admitted because it was "inflammatory and unnecessary" because K.O. testified at trial.

¶ 20. Following defendant's objection to the audio under Rule 403 arguing that "the only purpose of [the audio] is to inflame the emotions of the jury," the court applied the Rule 403 balancing test. First, considering the probative value of the evidence, the court stated that "typically, we're relying on witness testimony to describe that for us and put in words what one can easily observe and hear through emotion. When there is a recording that captures that, that's better than descriptions." Regarding the audio's potential for prejudice and weighing it against the probative value, the court noted that "this is not something where the content[s] of the statements are something to inflame the jury . . . This is just seeing the actual mental, emotional condition of the person" and that it was the "best evidence" of the situation and an "opportunity to capture what this young person at the time, who has now matured into an adult, and it's hard to recapture that."

¶ 21. The court properly exercised its discretion in this case by considering the possibility of undue prejudice when it addressed whether the audio was intended to "inflame" the jury. It also considered the audio's probative value by discussing the way that the audio could help the jury understand K.O.'s emotional condition on the day in question. These are not "clearly unreasonable grounds." State v. Herring, 2010 VT 106, ¶ 4, 189 Vt. 211, 19 A.3d 81. Defendant has not met his burden to show that the court's decision to admit the audio was outside of the scope of the court's discretion. Id.

## B. Dating Contracts

¶ 22. At trial, the State introduced two different handwritten "contracts" between defendant and K.O. and defendant and A.S. describing rules and expectations related to each complainant's sexual activity. Each contract graphically describes what sexual contact the girls were allowed to have with men other than defendant, and what contact they were restricted from having. Defendant argues that "the evidence of . . . the contracts that the girls signed with respect to what they could and could not do with their boyfriends should not have been presented to the jury because it was simply not relevant." (emphasis added).

¶ 23. Defendant asserts that he preserved this argument when he "objected to the State's introduction of [the contracts]." Defendant points to the trial transcript where defendant objected to the contracts, nebulously stating his objection was "subject to previous objections [and] renewing previous objections" to the contract with A.S. and that defendant would "renew the previous objection" to the contract with K.O. However, defendant includes no record cite to indicate what specific "previous objection" defendant was referring to or on what grounds the objection was made. Vermont Rule of Appellate Procedure 28(a)(4)(A) requires that an appellant's brief outline "the issues presented, how they were preserved, and appellant's contentions and the reasons for them—with citations to the authorities, statutes, and parts of the record on which the appellant relies." "This Court is not required nor about to undertake a search for claimed error where it is not adequately briefed, supported by argument, or pointed out in the record before us." In re Wright, 131 Vt. 473, 490, 310 A.2d 1, 10 (1973) (per curiam). Defendant here has failed to indicate how his arguments were preserved below.

¶ 24. In any event, this Court's independent review of the record indicates that this is the first time defendant raises the argument under Vermont Rule of Evidence 401 and 402 that the contracts should not have been admitted because they are not relevant. Defendant first moved to exclude the contracts in a motion in limine on July 29, 2020, specifically stating that

10

"the ground for such exclusion is V.R.E. 403." After the court's ruling that the contracts were admissible, on February 1, 2021, defendant "ask[ed] the court to reconsider" arguing that the contracts are "open to misinterpretation and likely to severely prejudice [defendant,]" referencing the language in Rule 403. At a subsequent motion hearing, defendant asked the court to reconsider its ruling once again and argued that the contracts should be excluded under Rule 403, stating, "considering the 403 aspects of [the contracts] and how [they] could be interpreted . . . . It would be extraordinarily prejudicial. And if there's no probative value other than generic attempts to control, it would just seem that the bounds would weigh in favor of not including them."

¶ 25. Defendant's objections to the contracts on Rule 403 grounds below is not sufficient to have raised the issue of the contracts' relevance with the specificity and clarity required to "give[] the trial court a fair opportunity to rule on it." State v. Brink, 2008 VT 33, ¶ 6, 183 Vt. 603, 949 A.2d 1069 (mem.) (quotation omitted). Rule 403 assumes relevance: the rule pertains to the "exclusion of <u>relevant</u> evidence" and begins by describing the potentially excludable evidence as "<u>relevant</u>." V.R.E. 403 (emphases added). The record indicates that defendant specifically pointed the court to Rule 403, not Rules 401 or 402. As we have frequently cautioned, "[a]n objection on one ground does not preserve an appeal on other grounds." State v. Bubar, 146 Vt. 398, 400, 505 A.2d 1197, 1199 (1985); see also V.R.E. 103(a)(1).

¶ 26. This Court's review indicates that defendant did not preserve his argument that the contracts were inadmissible for lack of relevance. Therefore, we do not address defendant's arguments because his objection to the admissibility of the contracts under Rules 401 and 402 was not preserved and because he does not argue plain error. See State v. Lyddy, 2025 VT 1, ¶ 19, __ Vt. __, __ A.3d __ (declining to address defendant's unpreserved argument that evidence

was irrelevant); State v. Hinchliffe, 2009 VT 111, ¶ 34, 186 Vt. 487, 987 A.2d 988 (declining to address claim first raised on appeal absent plain-error argument).

## C. Prenuptial Agreement

¶ 27. At trial, the State introduced a prenuptial agreement between defendant and his wife Katie made before their marriage in 2004. Relevant to defendant's argument, the agreement contained requirements that Katie agree to "be as pleasant as possible" at all times, that she weigh less than defendant, that defendant would make "any and all decisions in the relationship," that neither party would "go out without each other," and that both would "adhere to their family values" as much as possible. A requirement that mentioned anger-management classes for both parties was redacted. As above, defendant argues that defendant's " 'controlling nature' demonstrated by the prenuptial agreement . . . was not related to any disputed element of the case" and, therefore, that "the evidence of the prenuptial agreement [defendant] signed with his wife . . . should not have been presented to the jury because it was simply not relevant."

¶ 28. Defendant points to the trial transcript where defense counsel argued that the agreement had "nothing to do with the allegations," but had "extraordinarily inflammatory comments on it." The State responded that the agreement "show[s] Katie's fear of the defendant. It goes to show his control over her . . . [and] several reasons why she was very hesitant to . . . not do everything he told her to do." The State also argued that it helped counter the defense's allegation that "she changed her story" because of an offer of immunity, and instead, "[i]t goes to give her another motive for not saying anything. She's terrified of the defendant. He's had control on her throughout their relationship."

¶ 29. The court reasoned that the prenuptial agreement "has become part of the full picture in rebuttal" to the argument that Katie was merely testifying against defendant because of the State's offer of immunity. The court also stated that it did not "think it's unfair prejudice" given the defense's concession that the defendant was a controlling person in the opening

statement. However, upon further consideration, the court excluded the paragraph that referenced anger/stress management because "it can lead to a lot of conjecture" related to the sexual-assault charges and because the rest of the document included "plenty of [other] relevant information" regarding defendant's control over Katie. The court specified that "if the issue is showing control, [the agreement] explains some of her fears or concerns and motivations in testifying."

¶ 30. Giving defendant the benefit of the doubt that he sufficiently raised an objection under V.R.E. 401 by stating that the agreement had "nothing to do with the allegations"—even though the language he used also implicated Rule 403—defendant's argument on appeal fails. Defendant has not met his burden to demonstrate that the court abused its discretion. Herring, 2010 VT 106, ¶ 4 ("On appeal, it is the defendant's burden to show that the trial court abused its discretion by ruling on clearly unreasonable grounds."). The trial transcript indicates that the court considered both sides of the relevancy argument and concluded that the agreement was relevant to Katie's credibility and as a rebuttal to any immunity argument raised by defendant. While defendant might disagree with the court's assessment, the fact that defendant or another court may have decided differently is not sufficient to demonstrate an abuse of discretion. Id. The court's ruling was based on appropriate considerations and not clearly unreasonable. Therefore, the court did not abuse its discretion.

### D. Array of Historical Photographs

¶ 31. At trial, the State introduced a series of photographs showing K.O. and A.S. at different ages—corresponding generally to when the charged sexual assaults and lewd and lascivious conduct occurred. On appeal, defendant argues that "[a]llowing the State to submit photos of the girls at the various ages that they claimed to have been abused was not related in any way to the substance of the allegations" and further states that "[t]he photos were inflammatory and gratuitous."

¶ 32.   Following defendant's Rule 403 objection to the photo array, the court considered arguments from both defendant and the State and concluded that the State could offer the photographs because it was probative to "the entrustment factor [within the aggravated sexual assault charge], which has to do with minors under the care and custody of an adult" and that the photo display used to represent that aspect of the issue before the jury was not "unduly prejudicial or enflaming passions."

¶ 33.   Defendant argues that the photo display in this case is analogous to the photos used to elicit the location of the victim's body from the defendant in State v. Young, 196 S.W.3d 85 (Tenn. 2006).  In that case, the Supreme Court of Tennessee explained that the photos of the victim throughout her childhood shown to the defendant "figured into Defendant's motives in deciding to confess his murder" but that "the motives underlying his confession had only marginal relevance" to the case.  Young, 196 S.W.3d at 105-06.  In direct contrast, here the age and impressionability of the minors—demonstrated by the photographs—are far more closely related to key elements of the charges against defendant, bolstering the probative value of this photo array.  See, e.g., 13 V.S.A. § 3252(d) (describing victim's minority and entrustment to perpetrator's care as an essential element of crime).

¶ 34.   We conclude, as above, that defendant has not met his burden to show that the court's decision to admit the photo display was outside the scope of the court's discretion.  The court considered the factors articulated in the rule, properly weighed the probative value of the photographs as they related to the specific charges, considered whether there was any undue prejudice, and made a decision within its discretion.

### E.  Vulva Diagram

¶ 35.   At trial, the State used a diagram of a vagina and vulva to facilitate K.O. and A.S.'s descriptions of the sexual assaults and lewd and lascivious conduct.  On appeal, defendant

argues that the "admission of the diagram into evidence . . . allowed an inflammatory demonstrative exhibit where none was necessary."

¶ 36.    After defendant's objection under Rule 403, the court concluded that the diagram had probative value because "[t]he statute defines some of the anatomical parts, contact with which can constitute as a sexual act; among those are the vulva. [The diagram] has that labeled," because "[the diagram] helps the State also establish that the witness is fully understanding and describing the parts" and because "some of the actual forms and types of contact may be pertinent." Regarding prejudice, the court pointed out that "[i]t's a linear depiction of female anatomy in the genital region; it is labeled with the various parts" and that "it doesn't look like the actual image of a person; it's representation of an image," concluding that the diagram was not "something that's going to enflame the undue sympathy towards the State or enflame passion," but rather was "a pretty straightforward linear depiction." In so doing, the court applied the Rule 403 balancing test and articulated clear reasons for why the evidence was probative of the charges, not needlessly cumulative because it ensured accurate communication to the jury, and not unduly prejudicial due to the dearth of graphic detail.

¶ 37.    As above, defendant has not shown that the court's decision to admit the diagram was outside of the scope of the court's discretion. The court considered the factors articulated in the rule, properly weighed the probative value of the diagram against any prejudice and made a decision within its discretion.

¶ 38.    In sum, the court did not abuse its discretion when it admitted the audio recording, the prenuptial agreement, the photo display, or the diagram. Furthermore, we do not reach defendant's argument that the contracts were not relevant because it was not preserved below. Finally, because we hold that the trial court did not abuse its discretion regarding any individual piece of evidence, we reject defendant's argument that the trial court's rulings cumulatively undermined his right to a fair trial. See State v. Caballero, 2022 VT 25, ¶ 42, 216 Vt. 406, 279

A.3d 676 (rejecting defendant's argument that cumulative impact of concerns denied defendant fair trial when court did not find any ruling prejudicial).

## IV. Jury Instructions

¶ 39. Defendant objects to two aspects of the jury instructions: he argues that the court impermissibly directed the verdict for charges I and II on the element of K.O.'s age and he argues that the court committed plain error by failing to clearly articulate the relevant sexual conduct for each sexual-assault charge. We conclude that the instructions adequately set out the elements of the sexual-assault charges without directing a verdict on K.O.'s age and that there was no plain error in the description of the conduct needed to support each sexual assault charge.

### A. Directed Verdict Argument

¶ 40. When outlining the first two sexual-assault charges, the court stated that "[c]harge I and II charge the same type of crime, sexual assault against [K.O.], who was under the age of eighteen years old and who is [defendant's] child." The court then stated that "the State must have proven each of the essential elements beyond a reasonable doubt" and then outlined the essential elements: "the essential elements are that on the date and place alleged: (1) [defendant]; (2) engaged in a sexual act with [K.O.]; (3) he did so intentionally; (4) [K.O.] was under the age of eighteen, in or about [2013/2015]; and (5) [K.O.] was [defendant's] child and/or entrusted to [defendant's] care by authority of law." The court concluded its explanation, requiring that "[i]f the State has not proven each of the essential elements of each charge beyond a reasonable doubt, then you must find [defendant] not guilty. However, if the State has proven all of the essential elements beyond a reasonable doubt, you must return a verdict of guilty."

¶ 41. Defendant argues that the court impermissibly directed the verdict on the elements of age and entrustment when it stated that "[c]harge I and II charge the same type of crime, sexual assault against [K.O.], who was under the age of eighteen years old and who is [defendant's] child."

16

¶ 42.   "[J]ury instructions fall within the ambit of the trial court's discretion." State v. Hendricks, 173 Vt. 132, 142, 787 A.2d 1270, 1278 (2001). "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole were misleading or inadequate to aid the jury's deliberations." State v. Rolls, 2020 VT 18, ¶ 7, 211 Vt. 568, 229 A.3d 695 (quotation omitted). Consequently, we look to the entirety of the charge "with an eye to its general content, and not piecemeal in isolated segments." Knapp v. State, 168 Vt. 590, 591, 729 A.2d 719, 720 (1998) (mem.). "We will assign error only where the instructions undermine our confidence in the verdict." State v. Trombly, 174 Vt. 459, 460, 807 A.2d 400, 403 (2002) (mem.).

¶ 43.   When instructing the jury here, the court's description of the charge directly tracks the required elements of the charged crime. Defendant was charged under 13 V.S.A. § 3252(d) which states "[n]o person shall engage in a sexual act with a child who is under the age of 18 and is entrusted to the actor's care by authority of law or is the actor's child." Consequently, a description of the sexual assault against K.O., her age at the time of the assault, and her relationship to defendant are not only relevant but critical to a description of the charges alleged under § 3252(d). Furthermore, throughout the course of the instructions, the court informed the jury that "the State must have proven each of the essential elements beyond a reasonable doubt," and that the jury could "only convict [defendant] for one or more of the charged crimes if [it found] that each of the elements for each crime has been proven beyond a reasonable doubt." The court also described K.O.'s age and relationship with defendant as essential elements of the crime: "[t]he fourth essential element is that [K.O.] was under the age of eighteen in [2013/2015]" and "[t]he final essential element is that [K.O.] was [defendant's] child and/or was entrusted to his care by authority of law in [2013/2015]."

¶ 44.   Taken as a whole, the instructions were not misleading or inadequate to aid the jury in their deliberations—they began with a description of required details of the charged crimes, described the essential elements including K.O.'s age and relationship to defendant, and

17

instructed the jury that a guilty verdict required that the State prove those essential elements beyond a reasonable doubt. The court's instructions did not effectively direct a verdict on any element of the crime. They adequately explained the elements of the crime and, therefore, there was no abuse of discretion.

## B. Lack of Clarity Argument

¶ 45.    Defendant next argues that "the court's confusing jury instructions failed to ensure clarity, much less unanimity, as to what facts supported the element of 'sexual conduct.' "

¶ 46.    As described above, this case concerned a total of twelve charges including four charges of sexual assault and repeated sexual assault of K.O., each related to a different specific sexual act or series of repeated sexual acts. When describing these sexual-assault charges, the court included the following broad language on multiple occasions in the jury instructions: "[a] 'sexual act' means contact between persons consisting of contact between the penis and vulva, the penis and anus, the mouth and the penis, the mouth and the vulva, or any intrusion, however slight, by any part of a person's body or other object into the genital or anal opening of another." For each specific charge, the court then also detailed which specific type of sexual act was at issue. For example, for the first charge against defendant, the court began with the broad definition of sexual act and then specified that: "[t]he State has charged [defendant] as follows: [defendant] . . . in or about 2013, engaged in a sexual act with a child who was under the age of eighteen and is his child, to wit, contact between his penis and the mouth of [K.O.]" Then, when describing the relevant essential element of the first charge, the court reiterated that "the alleged conduct for the sexual act is between [defendant's] penis and [K.O.'s] mouth."[2]

---

[2]    This is an example of the level of specificity used consistently by the court in its instructions to describe the sexual act necessary for each relevant sexual-assault charge. Because the other charges contained the same level of specificity, there is no reason to quote each of the other individual sexual acts described by the court when relating the essential elements to the jury.

¶ 47. Defendant objects to the court's use of the broad description of "sexual act" because he argues that it "expanded what the jury was allowed to consider." Defendant concedes that he did not preserve this issue at trial but argues that the court's ruling was plain error. Because of that assertion, we review this issue for plain error. State v. Doleszny, 2004 VT 9, ¶ 10, 176 Vt. 203, 844 A.2d 773. "Plain error exists only in exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." State v. Pelican, 160 Vt. 536, 538, 632 A2d 24, 26 (1993) (quotation omitted). Furthermore, "[e]rror will be assigned only when the entire charge undermines confidence in the verdict." State v. Carpenter, 170 Vt. 371, 374-75, 749 A.2d 1137, 1139 (2000).

¶ 48. While the court's initial definition of "sexual act" was broader than necessary given each of the specific allegations, the court also clarified on multiple occasions the exact alleged sexual conduct required for the jury to find defendant guilty of each sexual-assault charge. Defendant cites State v. Goyette to support his argument that the instructions were plain error. 166 Vt. 299, 304, 691 A.2d 1064, 1067 (1997). In Goyette, the court broadly defined the term "harassment" and then told the jurors that they could convict the defendant if they agreed "that he committed at least one of the six or so acts alleged by the State." Id. at 303, 691 A.2d at 1067 (emphasis added). On appeal, this Court held that plain error existed because "the court's broad definition of harassment permitted defendant to be convicted on the basis of virtually any behavior." Id. at 304, 691 A.2d at 1067. The instructions in this case did not have the same infirmity. Here, following the broad definition, the court also specified the act necessary for the relevant "essential element" of each charge on multiple occasions and instructed the jurors that they must find that the State has "proven each of the essential elements beyond a reasonable doubt" to return a guilty verdict. In the absence of an affirmative showing to the contrary, "[i]t is presumed that the jury followed the instructions." State v. Fisher, 134 Vt. 339, 341, 360 A.2d

19

102, 104 (1976).  Consequently, analyzed as a whole, these instructions do not undermine any confidence in the verdict.  We conclude that there was no plain error.

## V.  Conclusion

¶ 49.    We conclude that the trial court did not abuse its discretion during the jury draw and the court appropriately chose the alternate juror.  The court did not abuse its discretion when admitting the audio conversation with K.O., the prenuptial agreement, the photo display, or the diagram.  We do not address defendant's argument that the "contracts" were not relevant because it was not preserved.  Finally, we conclude that the court did not impermissibly direct the jury in its instructions and there was no plain error in the court's description of the sexual acts necessary to convict defendant on each charge.

Affirmed.

FOR THE COURT:

Associate Justice

20